**EH YACHT, LLC, Plaintiff,**

v.

**EGG HARBOR, LLC; John Didonato, Gigi Didonato, Rudolph Lehnert, Robert Hazard, and Jane and John Does A through Z, jointly and severally and in the alternative, Defendants.**

No. 99–CV–2608 (JBS).

United States District Court, D. New Jersey.

Jan. 10, 2000.

Don P. Foster, Eugene F. Chay, Mesirov Gelman Jaffe Cramer & Jamieson, LLP, Cherry Hill, NJ, for Plaintiff.

Anne C. Singer, Robert F. Zielinsky, Charles M. Hart, Wolf Block Schorr and Solis–Cohen, Camden, NJ, Nelson Clarence Johnson, Hammonton, NJ for Defendants.

## OPINION

SIMANDLE, District Judge.

## I. INTRODUCTION

In this trademark infringement dispute, two companies each claim the right to use the name EGG HARBOR in connection with the manufacture and sale of luxury sports fishing yachts following the November 1997 cessation of operations of the registered owner of the Egg Harbor mark, Marine Acquisitions, Inc. ("Marine"). Plaintiff—EH Yacht, LLC, and its principal, Dr. Ira Trocki—claims to have purchased title to the name Egg Harbor, and the related trademark of a stylized sailfish wearing a crown, in September 1999 from the statutory receiver court-appointed to wind up Marine's financial affairs. Plaintiff has readied its manufacturing operations, and is now close to completing its first vessel. Defendants—Egg Harbor LLC, and its principals John and Gigi DiDonato—claim that Marine Acquisitions abandoned the EGG HARBOR trademarks when it ceased operations without intent to reopen the business or otherwise use the mark, and that by May 1998, defendant was taking steps to use the abandoned mark.

Presently before the Court are the parties' cross-motions for preliminary injunctive relief. First, defendant Egg Harbor LLC moved to preliminarily enjoin plaintiff (and counterclaim defendant) EH Yacht LLC from using the mark Egg Harbor in connection with its new company. Defendant Egg Harbor LLC, to prevail on its motion, must show, among other requirements for preliminary injunctive relief, that it is likely to prevail on the merits of its claim against EH Yacht LLC. Egg Harbor LLC has the trial burden of demonstrating by clear and convincing evidence that the trademark was abandoned within the meaning of section 45 the Lanham Act, 15 U.S.C. § 1115. This burden will require examination whether there was absence of an intent to resume use of the trademark by those having the right to do so.

In the cross-motion for preliminary injunctive relief, plaintiff EH Yacht LLC seeks to demonstrate that it is the owner of the Egg Harbor trademark as the holder in due course of the assets of the company once known as Egg Harbor Yacht Co. by virtue of an acquisition, for fair market value, of the EGG HARBOR name and mark from the statutory receiver appointed to dispose of Marine's assets. Plaintiff will have the burden of proving its ownership at trial by a preponderance of the evidence, and alleges that it is likely to succeed in meeting this burden. If EH Yacht LLC is able to demonstrate that the statutory receiver indeed possessed all

right, title and interest to the mark at the time the receiver sold it to plaintiff, then it should prevail at trial.

Both sides assert that their adversary's actions are unlawful and are causing much confusion in the public's perception of Egg Harbor Yachts. Specifically, the yacht-buying market is unable at this point to tell who is the rightful successor to Egg Harbor's prestigious and venerable name and mark. Both sides assert that they are suffering irreparable harm at the hands of the other company due to confusion in the marketplace and a consequent loss of Egg Harbor's market share.

The facts of this case present an unusual combination of federal trademark law and creditors' rights. The Court is called upon to determine what, if any, rights a creditor has to a registered trademark when the trademark owner discontinues manufacture of the trademarked product and becomes insolvent. As will be discussed in further detail below, if the trademark was abandoned before the creditor's rights vest, then the creditor's interest in the trademark is dissolved. If, on the other hand, the trademark was not abandoned, then the creditor's rights to the trademark vest upon seizure of the debtor's assets. The principal issue then boils down to the question of trademark abandonment, *i.e.*, whether defendant will likely be able to prove by clear and convincing evidence that the trademark was abandoned with no intent to resume use in a reasonable period of time. If abandonment is not demonstrated to this standard, the issue becomes whether the plaintiff is likely to succeed in its claim of rightful ownership though its acquisition of the Egg Harbor trademark from the statutory receiver. For reasons discussed herein, the Court will resolve all issues in favor of the plaintiff, EH Yacht LLC, and will deny defendants' application for preliminary injunctive relief. For these same reasons, the Court will grant plaintiff's cross-motion for preliminary in-

junctive relief, and will enjoin Egg Harbor LLC from using the Egg Harbor name and logo in connection with the manufacture and sale of luxury yachts.

This Court has received into evidence the numerous exhibits and affidavits accompanying the parties' briefs, together with the arguments of counsel on December 13, 1999. The following findings are entered pursuant to Rules 52(a) & 65, Fed. R.Civ.P.

## II. *FINDINGS OF FACT*

The Egg Harbor Yacht Co. ("EHYC"), founded in 1946, once was one of the nation's most prominent boat builders, and one of Egg Harbor City's biggest employers. The Egg Harbor name has been in use in connection with inboard motor boats, yachts, and cruisers since the company's inception in 1946. The most recent renewal of the company's trademark on the Egg Harbor name was filed on behalf of the Egg Harbor Yacht Co. in December 1994, and was approved in September 1996. USPTO Serial Number 74–616074; Registration Number 2002266, *available in* U.S. Patent and Trademark Office Trademark Text and Image Database *<http://www.uspto.gov/tmdb/index.html>*. The Egg Harbor logo, a stylized sailfish wearing a crown,[1] has been in use at least since the late 1960s. The latest trademark filing on the logo, was made in 1986, was approved in May 1994, with Egg Harbor Yacht Co. listed as owner. USPTO Serial Number 73–631322; Registration Number 1835359.

Despite EHYC's stellar reputation, the company suffered a series of financial setbacks and ownership changes. These difficulties culminated in a filing for Chapter 11 bankruptcy in 1992. After the bankruptcy filing, the company re-emerged with a new owner, William Robinson. As part of Robinson's effort to correct EHYC's financial condition, on September

---

1. As reproduced from USPTO Serial Number 73–631322; Registration Number 1835359, available in *<http://www.uspto.gov/tmdb/index.html>*, this logo appears as follows:

13, 1993, the company obtained a federal Department of Housing and Urban Development ("HUD") loan through the City of Egg Harbor in the principal amount of $3,550,000.00 to finance EHYC's exit from bankruptcy. The EHYC loan was secured by a duly recorded Mortgage and Security Agreement. To further secure the obligation of EHYC to the City of Egg Harbor, EHYC granted the city a later-perfected Uniform Commercial Code ("UCC") security interest in EHYC's assets, including, among other things, EHYC's owned trademarks and trade names.[2] The security interest was to last until the entire indebtedness was paid off. All security interests were assigned to the New Jersey Economic Development Authority ("NJEDA"), an instrumentality of the state of New Jersey, on September 13, 1993.

In April 1996, some of Robinson's investors, incorporated under the name of Marine Acquisitions, Inc. ("Marine"), bought Egg Harbor Yacht Co. from Robinson with the consent of the NJEDA. As part of this sale, consummated on July 1, 1996, EHYC specifically assigned the EGG HARBOR name and trademark to Marine Acquisitions. (Weiss Cert, Ex. A(B)(A), Pl.'s Ex. 11) (seller "assigns, the entire right, title and interest in, to and under all of Egg Harbor's trademarks, service marks . . . related logos . . . whether registered or not"). The record before the Court shows that at the time of the sale to Marine Acquisitions, the trademark to the Egg Harbor name had been registered and the logo registration was underway. Therefore, at the time of sale, the EHYC

validly assigned the EGG HARBOR name and logo to Marine.

As a condition of NJEDA's approval of the sale of EHYC's assets to Marine, Marine confirmed to the NJEDA its obligation to repay the loan on the terms and conditions of the 1993 loan, which preserved the NJEDA's security interest in the Egg Harbor Trademark. Among Marine's other creditors were the United States Housing and Urban Development Corporation, Detroit Diesel Capital Corporation, and Bevis Financial Co.

In October 1997 Marine temporarily suspended Egg Harbor manufacturing operations for a day due to cash flow problems. It resumed operations thereafter, only to again suspend manufacturing on November 14, 1997. No public proclamations of the company's intent were made in November 1997.

Confusion surrounded Marine Acquisition's decision to cease manufacturing, and there is a crucial dispute of fact as to whether the production of Egg Harbor Yachts was simply being suspended, or was being discontinued altogether. In a declaration dated December 13, 1999, former Marine Acquisitions financial operations officer Marita James, who was in charge of Marine's debt maintenance and payroll, stated that the suspension of operations was just that—a suspension, and that when making the decision to close the production plant, she assumed that creditors would take control of the assets and dispose of them. According to James, there was no intent "to abandon to the public domain the Company trademark or the trade name 'Egg Harbor', which [she]

**2.** Although not raised as an issue by the parties, the UCC financial statement filed in connection with Egg Harbor City's security interest listed as collateral EHYC's "general intangibles, including without limitation, all patents, trademarks and tradename pertaining to Borrower's molds, casts and models used in the construction of fiberglass vessels. . . . . [A]nd any other property or asset now owned or hereafter acquired by the Borrower or in which it has an interest." Although a determination of the priority of NJEDA's

interest in the trademarks cannot be made on the record before the Court, an argument could be made that, after taking assignment of this security agreement, the NJEDA had a perfected security interest in the Egg Harbor logo and tradename. (Weiss Cert, Ex. E, UCC–1 Financing Statement # 14246, filed Oct. 22, 1993, Sched. A(a) & (e), Pl.'s Ex. 11.) At a minimum, the financing statement shows that EHYC's creditors regarded the Egg Harbor trademarks to be valuable collateral in the possession of Marine Acquisitions.

considered to be a valuable asset of the Company belonging to the creditors." (M. James Decl. ¶¶ 4–5.) Further supporting the notion that the Egg Harbor name was not dead, in an interview with a local paper after the plant closing, one officer said that Marine was negotiating with the lender and hoped to work again under different ownership. Another officer stated in the same interview that he hoped to work with employees "under different ownership." (Pl.'s Ex. 9.) These statements indicating that the closing was a mere suspension of operations contrast with the declaration of Walter Johnson, a former director of Marine Acquisitions, who said the decision to terminate Marine's operations was sudden and final, and that the directorship had no hope of reviving the company. (W. Johnson Decl.) At any rate, the company's owners did not attempt to sell the company or reorganize it in bankruptcy. Nor was any effort made to shield any of Marine's assets from its creditors.

On Monday, November 17, 1997, the Monday following Marine's Friday cessation of operations, Mr. William Kendall, NJEDA Senior Asset Recovery Officer, appeared on site, secured the premises and took custody and control of the plant and equipment. On November 18, 1997, the NJEDA placed signs around the premises that stated: "THIS PROPERTY HAS BEEN REPOSSESSED BY THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT BY ACTION OF THE NEW JERSEY ECONOMIC DEVELOPMENT AUTHORITY, ITS AGENT." (Pl.'s Ex. 44.)

Soon thereafter, on December 1, 1997, the NJEDA commenced a receivership action in the Superior Court of New Jersey, Atlantic County. The purpose of this action was to retrieve boats removed from the premises by a competing secured creditor, Detroit Diesel, and otherwise marshal and sell off the assets of the company. Although a statutory receiver was not appointed until late 1998, after the initiation of the receivership action Mr. Kendall was contacted by approximately twenty individuals about the sale of the Egg Harbor name and trademark. (Kendall Dep. 79:15–20.) Mr. Kendall testified at his Deposition dated December 3, 1999 that in all cases, his response to such queries was that the NJEDA was unable to sell the company name or other assets, and that the person who would have the authority to do so was the Statutory Receiver. (*Id.* at 80:11–18.)

In late 1997 and early 1998, Detroit Diesel, the secured creditor with the primary security interest in boats under construction at the time plant operations ceased, repossessed and sold several partially-completed boats to parties interested in acquiring them at a discount. One such buyer was defendant John DiDonato. Ultimately, Mr. DiDonato decided not to keep the boat himself, but to sell the 42–foot yacht, and two other partially completed yachts, a 37–foot boat and a 52–foot boat. In order to complete fabrication of these yachts, Mr. DiDonato, acting in his capacity as agent for his company Vision Properties LLC, leased from the NJEDA molds necessary to make fiberglass parts necessary to complete the boat hulls. (Pl.'s Ex. 4.) Mr. DiDonato then copied the molds, and "splashed" the hull of the 52–foot boat. Apparently, splashing is a reverse-engineering process during which a wax mold of the hull is made, and new boats molded therefrom. (Declaration of Robert Hazard at ¶ 19.)

During this same period, there was considerable confusion in the market as to whether Egg Harbor was planning to resume business. According an interview with a yachting industry publication, as of mid-December 1997, Egg Harbor dealers were not told of the status of the Marine shutdown, and continued to sell Egg Harbor boats purchased from Marine Acquisitions t/a EHYC. (*Soundings Trade Only*, Jan. 1998, Statement of Bill Cacciatore, Vice President of Harbor Yacht Sales in Dania, Fla., Ex. B of DiDonato Supp. Decl.) These sales of residual Egg Harbor

Yachts were still continuing as of January 1998: "Right now we're going to continue to sell their boats and believe that someone else will purchase the company and start building boats again.... Owners have been through this before. Hopefully this will turn out for the better." (*Id.*)

In early 1998, Mr. DiDonato decided to go into the yachtmaking business and quickly began taking steps to appropriate the goodwill surrounding the EGG HARBOR name for his own company. DiDonato contacted Attorney Nelson Johnson about the prospects of taking over Egg Harbor, and Mr. Johnson began his investigation into the requirements of such a takeover in February 1998. In April 1998, Mr. Johnson and Mr. DiDonato contacted Mr. Kendall, and NJEDA counsel Joan Weidner, both of whom apparently asserted that the NJEDA had the authority to sell Marine's Assets, including intellectual property, even before the appointment of the statutory receiver. (N. Johnson Decl. ¶ 5.) Johnson contacted William Robinson, a former CEO of Marine, who apparently asserted that the Egg Harbor marks were personally held by him, and he had exclusive rights to market title to the name and logo. Additionally, Johnson contacted the attorney for the owners of EHYC's predecessor, Egg Harbor Boat Company, James Mercanto and Robert Traenkle. Both Mercanto and Traenkle apparently told Johnson that *they* owned the mark.

Concluding that there was confusion over the ownership of the name Egg Harbor, and that this confusion meant that the name had fallen into disuse, in May 1998 DiDonato began using the name Egg Harbor in connection with his new yacht building enterprise, notwithstanding the ongoing receivership action in the Superior Court of New Jersey. In September 1998 DiDonato formed the entity now known as Egg Harbor LLC, the operations of which included "splashing" [3] the hull of the Egg Harbor Yacht he bought from Detroit Diesel, and making parts from molds leased from the EDA.

DiDonato made no public claim of having bought Marine's assets, nor did he claim to have rightfully purchased the EGG HARBOR name. Instead, DiDonato's offered only vague public explanations of how he came to head the manufacturer of Egg Harbor Yachts. For example, an Egg Harbor LLC website operated by DiDonato in connection with his venture states that DiDonato took the helm of Egg Harbor LLC in early 1998. The site includes a press article that quoted DiDonato as stating he "isn't sure how he became owner of Egg Harbor ... [b]ut now he's in the driver's seat, he wants to steer the company back to the top." (<http://www.eggharboryachts.com/eh-sound. htm>, Pl.'s Ex. 2 at 1 & 31.)

Hoping to quickly substantiate his title to the Egg Harbor trademarks he was using, defendant hired Intellectual Property Attorney Robert Zielinsky to advise him. Mr. Zielinsky concluded that the mark had become abandoned due to the abrupt discontinuance of manufacture of Egg Harbor Yachts, and was in disuse. There is no indication in the record, however, that defendants inquired into the rights of Marine's creditors to the trade name and mark at this point, notwithstanding the on-going receivership action. Having concluded that the trademark was, in essence, unowned due to Marine's cessation of operations, Zielinsky filed on plaintiff's behalf applications with the U.S. Patent and Trademark Office to cancel the

---

**3.** Although plaintiff characterizes this splashing as evidence of DiDonato's "unclean hands", and that this deed disqualifies DiDonato from equitable relief, the Court finds that it is clear under *Bonito Boats v. Thunder Craft Boats*, 489 U.S. 141, 163, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989), that unless a boat hull design is protected by federal patent law, the hull may be freely copied. For this reason, the Court finds that DiDonato's use of splashed hulls does not result in unclean hands. The Court does not presently reach the issue of whether such use of the hulls was contemplated by the agreement between DiDonato and Detroit Diesel.

existing trademark registration for the name Egg Harbor and the sailfish logo, and to have these trademarks registered to Egg Harbor LLC. (Zielinsky Decl. ¶ 6.) Those applications are still pending.

In December 1998, approximately one year after Marine Acquisitions closed its doors, the New Jersey Superior Court appointed David Weiss, Esquire as statutory receiver for the remaining assets of Marine Acquisitions, Inc. Weiss immediately did an accounting of the assets of Marine, and determined that Marine still owned the Egg Harbor trademarks being used by Egg Harbor LLC. Mr. Weiss determined that in order to obtain the best price possible for the company's assets, the business should be sold as a going concern to a sophisticated buyer, and that the company represented an unusual opportunity for someone to start up where the prior owners had left off.

Upon learning that Egg Harbor LLC was operating under the Egg Harbor flag, Weiss filed in state court for a Temporary Restraining Order enjoining DiDonato from using the Egg Harbor name. This application for emergency relief was denied by the New Jersey Superior Court on February 2, 1999 because there was no showing of irreparable harm as the receiver was not then manufacturing boats. (Oral Opinion of the Honorable L. Anthony Gibson, JSC, Docket No. ATL–C–14–99 (N.J. Super Ch. Div. Feb. 2, 1999), Pl.'s Ex. 12.) Judge Gibson made it clear that he was not ruling on the merits of the receiver's trademark claims. (*Id.* at 10:2–14.)

There is some dispute as to when, but sometime in early 1999 Weiss and Mr. DiDonato met to discuss a proposal under which Egg Harbor LLC would purchase from the receivership certain assets of Marine Acquisitions, including the Egg Har-

bor name and logo. According to Mr. Weiss, DiDonato quickly terminated this meeting. Soon thereafter, the receiver filed the present action in June 1999 on behalf of Marine Acquisitions, seeking to quiet title to the EGG HARBOR name and mark.

After Weiss filed the present action, he and DiDonato met again on August 19, 1999. (Weiss Decl. ¶ 10.) At this second meeting, Weiss states, he and DiDonato reached an agreement under which the receiver would drop the suit pending in this Court and sell Egg Harbor LLC all assets of Marine, excluding real estate, for approximately $377,000.00. Weiss declares that he and DiDonato also agreed that, once he had removed the tangible assets from the Egg Harbor site, DiDonato would leave the premises "broom clean".[4] (*Id.* at ¶ 11.) Weiss's understanding of these negotiations was memorialized in a letter to DiDonato dated August 24, 1999. In this letter, however, Weiss unilaterally raised the asking price to $452,000.00. DiDonato apparently found the disparity in asking price too great, and negotiations were terminated.

After these negotiations broke down, Weiss began discussions with Dr. Ira Trocki. He consummated a sale with Dr. Trocki on September 29, 1999, under which Trocki acquired all Marine assets for the sum of $1,450,000.00. This price did not include any guarantees to the Egg Harbor name or logo, but rather sold all assets "AS IS, WHERE IS AND WITH ALL FAULTS." (Receiver's Agreement of Sale, Pl.'s Ex. C, at ¶ 15.2.)

Concerned that Trocki would launch a competing Egg Harbor Yacht business, Mr. Zielinski contacted Dr. Trocki's attorney, Robert Grossman, Esquire to inquire into whether Trocki would observe the status quo pending a judicial resolution of the

---

4. This provision appears to have had significant financial implications in light of the fact that leaving the premises "broom clean" implies that the purchaser would have to bear the cost of disposing of environmental haz-

ards present at the Egg Harbor site, including asbestos, and possible ground contamination due to fiberglass residue seepage. (Zielinsky Decl. Ex. F.)

trademark issue. Zielinsky allegedly was told that Trocki had no intention of wading into the yacht-building business until the trademark issues were ironed out. Nevertheless, in November 1999 Trocki started up EH Yacht LLC, which professed itself to be the successor of the old Egg Harbor company in name and assets. In response, defendants instituted their motion for preliminary injunctive relief on November 24, 1999.

## III. CONCLUSIONS OF LAW

This Court has federal question jurisdiction pursuant to the Lanham Act 15 U.S.C. § 1051 et seq. Having read the parties' extensive submissions, and having heard oral argument on December 13, 1999, this Court now enters its conclusions of law on the present cross-motions.

### A. Preliminary Injunction Standards

■ The parties have filed cross motions for preliminary injunctions. The decision of whether to grant a preliminary injunction is an extraordinary remedy which should be granted only if the movant produces evidence sufficient to demonstrate the following four factors:

(1) a likelihood of success on the merits;

(2) the extent to which the movant will be irreparably injured by the conduct complained of;

(3) the extent to which preliminary relief will result in even greater harm to the nonmoving party; and

(4) the extent to which granting the preliminary relief will be in the public interest.

*Council of Alternative Political Parties v. Hooks,* 121 F.3d 876, 879 (3d Cir.1997)(citing *American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Board of Educ.,* 84 F.3d 1471, 1477 n. 2 (3d Cir.1996)(en banc)). The Third Circuit has held that the moving party must demonstrate both a likelihood of success on the merits and the probability of irreparable harm in the absence of injunctive relief in

order to obtain a preliminary injunction, and that a preliminary injunction granted by a district court will not be sustained on appeal if either of these requirements is not satisfied. *Hoxworth v. Blinder, Robinson & Co., Inc.,* 903 F.2d 186, 197 (3d Cir.1990).

### 1. Likelihood of Success on the Merits

Defendant Egg Harbor LLC's claim to the Egg Harbor trademark depends on a finding of abandonment. As there never was a public statement of intent not to resume use of the Egg Harbor mark, defendants' case at trial will turn on its ability to establish by clear and convincing evidence that the trademark had been abandoned and that there was no intent to resume use of the trademark. The issue of abandonment is governed by section 45 of the Lanham Act, 15 U.S.C. § 1115, *et seq.,* the definition section of which provides, in relevant part:

A mark shall be deemed 'abandoned' . . .

(1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. 'Use' of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

15 U.S.C. § 1127 (1994).

■ A party asserting abandonment of trademark must prove (1) discontinuance of use of the mark *and* (2) an intent not to resume use within a reasonably foreseeable time in the future. *Exxon Corp. v. Humble Exploration Co.,* 695 F.2d 96 (5th Cir.1983). Abandonment being in the nature of a forfeiture, both of these criteria must be strictly proved. *United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 139 (3d Cir.1981). This "strictly proved" standard has been held by a majority of courts to mean that abandonment must be proved by clear and convincing evidence. J. Thomas McCarthy, 2 *Trade-*

*marks and Unfair Competition* § 17:12 (4th ed.1999) (hereinafter *"McCarthy* § "); *Dial–A–Mattress Operating Corp. v. Mattress Madness, Inc.,* 841 F.Supp. 1339 (E.D.N.Y.1994). Egg Harbor LLC is not entitled to a statutory presumption that the mark has been abandoned because the period of non-use has not lasted three years.

### a. *Abandonment and Intent Not to Resume Use*

Under the first prong of the abandonment test, the defendants must establish by clear and convincing evidence that there has been a discontinuance of use of the mark. Defendants have argued that Marine's decision to close its doors in November 1997 was a final decision to terminate use of the Egg Harbor name, and that discontinuance of use can be inferred from this act of closing the manufacturing plant. However, the continued sales of Egg Harbor Yachts weighs against a finding of discontinuance of use. First, despite Marine's act of closing the plant, the Egg Harbor name, which had been held in high esteem for more than fifty years, continued to be used in the marketplace. As discussed above, the Egg Harbor mark continued to enjoy considerable goodwill in the marketplace even after Marine closed its doors, and there were continued sales of Egg Harbor Yachts during the period after Marine's closing. A former officer of Marine stated that the sale of these boats, considered Marine's unsold "channel inventory" continued at least until February 1999. (Hazard Decl. ¶ 11.) Although it is unclear who financially benefitted from the sales of these residual boats, whether it was Marine's creditors holding liens on particular vessels, or Marine's officers who had guaranteed repayment of loans secured by such vessel sales, or Marine's distributors who had taken title but not yet sold the new vessels to the ultimate consumers, the Court finds that the continued sales of new Egg Harbor Yachts ensured that the Egg Harbor tradename was still in use. *See American Motors Corpo-*

*ration v. Action–Age, Inc.,* 178 U.S.P.Q. 377 (Trademark Trial and Appeal Board 1973) (finding residual goodwill evidenced by continued sale of "Rambler" parts and accessories precluded finding of trademark abandonment three years after cessation of manufacture of Rambler automobiles). Absent a public proclamation of discontinuance of use, the continued sales of Egg Harbor Yachts allows the inference the public continued to associate the Egg Harbor mark with a single company. The Court also finds that the continued maintenance and active use of the Egg Harbor Yacht Owners Community Website, (<http://www.eggharborowners.org>, Pl.'s Ex. 17), even after the Marine Acquisitions closure, reinforces the image of Egg Harbor as a going concern. Based on the foregoing, the Court finds that defendant is unlikely to establish by clear and convincing evidence that it will prevail on the first prong, and that plaintiff is likely to show that there was not discontinuance of use of the mark simply because Marine closed its doors.

Turning to the second prong of the abandonment test—intent not to resume use—defendants must show that the circumstances clearly and convincingly establish an intent not to resume use of the mark. One such circumstance is a three-year period of nonuse, after which point the mark is presumed abandoned and the burden shifts back to the owner to prove non-abandonment, pursuant to 15 U.S.C. § 1127, *supra.* However, the Supreme Court has held in the past that even total non-use of a mark for over four years, and a resulting near-total loss of goodwill, was insufficient under the circumstances of that case to support a finding of abandonment. *Beech–Nut Packing Co. v. P. Lorillard Co.,* 273 U.S. 629, 47 S.Ct. 481, 71 L.Ed. 810 (1927) (Holmes, J.).

A threshold matter raised by the parties is whether intent to resume use should be based on the subjective intent of the *registered trademark owner,* or instead should

be an objective test based on the totality of evidence showing *an intent* not to resume use. Defendant Egg Harbor LLC argues that the standard by which to judge intent not to resume is a subjective one, and that the only intent that matters is the collective intent of Marine Acquisitions, Inc., the owner of the Egg Harbor trademark. Plaintiff EH Yacht LLC counters that, in the absence of a clear statement of whether Marine intended to abandon the mark, abandonment should be determined from the objective circumstances surrounding the purported non-use. In support of this position, plaintiff argues that the statute's use of the term "deemed" in reference to the circumstances surrounding abandonment should be taken as a Congressional command that intent not to resume use should be established by objective evidence, such as the duration of the non-use.

In determining whether intent not to resume use should be determined based on subjective or objective evidence, the Court first looks to the statutory definition of abandonment provided in 15 U.S.C. § 1127. It is axiomatic that when interpreting a statute, Courts should first look to the statutory language and whenever possible give that language its plain meaning. *United States v. Abraham*, 29 F.Supp.2d 206 (D.N.J.1998) (JBS). In this case, § 1127 is silent as to whether Congress intended the courts to evaluate objective or subjective evidence of intent to resume use of a trademark that has fallen into disuse, thus the statute is not clear on its face as to whether intent should be judged subjectively or objectively. The Court is aided however, by the canon of construction that statutory language must be read in context and a phrase gathers meaning from the words around it. *Jones v. United States*, 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999).

Here, the Court holds that Congress's use in § 1127 of the term "deemed"—a term that suggests an objective finding of abandonment by a factfinder—shows Congress's intent that a determination of intent not to resume use should be based on the totality of objective evidence of intent to resume use, not simply the intent of the registered trademark owner. Under this standard, so long as there is power to do so, *any* valid intent to resume use within a reasonable time becomes relevant. Thus, the Court holds that Egg Harbor LLC, the party wishing to show intent not to resume use under § 1127, must point to objective evidence that clearly and convincingly establishes that, among those that had an interest and right to do so, there was no intent to resume use of the Egg Harbor name within a reasonable time. Defendants' proposed interpretation would render meaningless most secured creditors' interests in a trademark. If only the registered owners' intention to resume use mattered, at the instant that a mark holder decided to go out of business, the trademark would dissolve, along with the creditor's interest in the mark as collateral. Such a result would be contrary to the well-established rule that creditors may name trademarks as valuable collateral securing repayment of loans.

Based on the foregoing analysis, the Court will examine the record for objective indicia of intent not to resume use and for evidence of loss of goodwill. This inquiry will not be limited to Marine's intent, but instead will take into account the intentions of Marine's creditors to validly resume use of the EGG HARBOR name within a reasonable amount of time following Marine's closure.

As noted above, however, Egg Harbor LLC has the burden of showing intent not to resume use by clear and convincing evidence. The "clear and convincing" standard requires that the movant must prove that his version of the facts is "highly probable" or "reasonably certain". *Black's Law Dictionary* at 577 (7th ed.1999). In this case, it is far from certain whether Marine's sudden suspension of operations evidences an intent not to resume use of the Egg Harbor marks.

The record before the Court shows that the defendants have adduced evidence showing that Marine's decision to stop operations was sudden, and that at the time the business's door closed, some of the company's principals did not intend to resume use of the Egg Harbor mark. Plaintiff has countered this evidence, however, with statements from other principals that they assumed operations would be restarted under new management. (*See e.g.* M. James Decl.) Defendants' "snapshot" approach would have the Court make a determination of intent not to resume use based only on the instant when Marine's principals made the decision to cease production. The Court finds that the an ambiguous decision to cease production due to financial constraints does not clearly and convincingly prove an intent not to resume use. There was much confusion surrounding the suspension of operations, and it appears to be an open question whether the company's principals intended to reorganize the business, sell the business to another concern, or simply allow its creditors to seize its assets and operate the business as a going concern until a buyer could be found.

For these reasons, the Court finds that defendants have failed to show by clear and convincing evidence that there was no intent to resume use of the Egg Harbor mark, and the Egg Harbor mark did not begin to "roll free" at the moment that Marine ceased manufacture of the boats. Because the mark had not definitively been abandoned, then, the Court finds that it is likely that plaintiff will be able to establish by a preponderance of the evidence that the Egg Harbor trademarks still were part of Marine's assets even after the plant closing. Because the marks remained part of Marine's Assets in May 1998, Marine and its creditors had the right to resume use of the Egg Harbor name and logo, not DiDonato.[5]

#### b. *Marine Acquisitions Inc.'s Secured Creditors*

Having determined that plaintiff is likely to establish at trial that the Egg Harbor name remained a part of Marine's assets, the Court turns to a discussion of the role of Marine's creditors in the disposition of the Egg Harbor trademarks. The conduct of Marine's creditors from the next business day after the factory's production stopped until plaintiff purchased the receivership's assets is relevant evidence of intent to resume use in a reasonable time as now discussed.

Section 10 of the Lanham Act, 15 U.S.C. § 1060, provides that a mark may be assigned or sold, so long as the good will of the business is also part of the assignment or sale.[6] It is well established that the law makes no distinction between voluntary and involuntary sales of trademarks, and that a trademark can be sold by a legal representative of the business when insolvent. *McCarthy* § 18:28. Where the trademark involved is not a personal one and the transfer is made by operation of law through bankruptcy or a general assignment for the benefit of creditors, most courts have held that a trustee in bankruptcy has the power to sell the goodwill of a company and its symbolic trademarks with other assets of the bankrupt. *Id.* (citing *Mutual Life Ins. Co. v. Menin,* 115 F.2d 975 (2d Cir.1940), *cert. denied.,* 313 U.S. 578, 61 S.Ct. 1096, 85

---

**5.** Because the Court now finds that there is not clear and convincing evidence of disuse of the mark or an intent not to resume use, the Court does not reach the issue of whether there is an explanation for non-use under the principles expressed in *Saratoga Vichy Spring Co. Inc. v. Lehman,* 625 F.2d 1037 (2d Cir. 1980) and *Defiance Button Machine Co. v. C & C Metal Products Corp.,* 759 F.2d 1053 (2d Cir.1985).

**6.** A registered mark or a mark for which application to register has been filed shall be assignable with the goodwill of the business in which the mark is used, or with that part of the goodwill of the business connected with the use of and symbolized by the mark.
15 U.S.C. § 1060.

L.Ed. 1536 (1941)). If the goodwill and marks have been validly assigned, albeit by operation of law via bankruptcy, the mark and good will then may be sold by the trustee in bankruptcy, and the buyer has superior rights to the marks than does the bankrupt. *Id.*

■ Under New Jersey's statutory receivership scheme, codified at N.J.S.A. 14A:14–1 *et seq.*, a receiver operates with much the same power as a trustee in bankruptcy. New Jersey law provides that a party may institute a receivership action where there is an imminent danger of property being lost or diminished in value, even without the creditor's formal filing for federal bankruptcy. N.J.S.A. 14A:14–2. Once a court has appointed a receiver, all title to the debtor corporation's assets, or every nature, vest in the receiver as of the date of his appointment. N.J.S.A. 14A:14–4(1). For the purposes of avoiding encumbrances, transfers and preferences, the right of the receiver shall relate back to the date upon which the receivership action commenced. N.J.S.A. 14A:14–4(1). The provisions of 14A:14–4 have been held to mean that a receiver's right to an insolvent corporation's property vest at the time of the filing of the action. *See Wilzig v. Sisselman,* 209 N.J.Super. 25, 31–32, 506 A.2d 1238 (App.Div.1986); *see also Umland v. United Public Service Co.,* 111 N.J.Eq. 563, 566, 163 A. 794 (1932) ("No matter how much time has intervened between the filing of the bill and ... the appointment of a receiver, the authority of the receiver in the premises dates back to the date of the filing of the bill of complaint.").

The record in this case includes abundant evidence of Marine's creditors' *de facto* and *de jure* intent to resume use of the Egg Harbor name. *De facto* intent is evidenced by the actions of the NJEDA. Almost immediately after Marine's sudden closure, the NJEDA and other secured creditors took possession of the company and repossessed their collateral. Soon thereafter, on December 1, 1997, the NJE-DA filed the relevant receivership action in New Jersey's Superior Court. Mr. Kendall, the NJEDA representative in charge of protecting the NJEDA's interests in collateral held by Marine, stated in his deposition that thereafter he received offers to buy Egg Harbor's goodwill and trademarks, but at all times he intended to dispose of Marine's assets as an "assembled economic entity", *i.e.,* as a company with a plant, equipment, and intellectual property including its trademarks. Defendants submit that there was confusion over who had the right to sell the Egg Harbor name, and that the NJEDA's intent to sell the Egg Harbor name is irrelevant. The Court disagrees. Because the NJEDA had an interest in seeing that its collateral was protected, and had a security interest covering general intangibles such as trademarks, the NJEDA's interests became highly significant upon Marine's loan default. The NJEDA certainly had a valid claim of right to the Egg Harbor name, thus it is highly relevant whether it had an intent to resume use of the marks.

The Court finds that the evidence proves that, even if it did not have a clear right to do so prior to the appointment of the receiver, the NJEDA had a *de facto* intent to revive the Egg Harbor name upon the sale of Marine's assets, and actively endeavored to marshal all assets of the closed company within the receivership. Simply because the NJEDA did not have the final power to dispose of the assets does not mean that there was not ample public notice that it was asserting its right to collect its collateral from Marine under the authority of the receivership court. Moreover, there is a valid explanation for the NJEDA's decision not to immediately sell off the trademarks or other of Marine's assets: because there was a pending receivership action, the receiver might later have avoided such transfers as improper or preferential. Instead, beginning just days after the cessation of Marine's operations, the NJEDA took all prudent steps to muster and conserve the

assets for eventual disposition as an ongoing economic entity, including the trademarks.

Furthermore, based on the very public display of the NJEDA and other creditors of padlocking the Marine premises and placing signs around the plant stating that the NJEDA had repossessed the property, any parties aspiring to take over the business were effectively put on notice that they would have to deal with the NJEDA. Any doubts as to the NJEDA's authority to repossess and dispose of Marine's collateral should have been resolved upon a ruling by the receivership court, not by commandeering the property as DiDonato has attempted to do. Here, the record is clear that instead of attempting to have the receivership court declare that the creditors had no right to the trademarks, DiDonato simply began using the marks.

Once appointed, the receiver clearly had *de jure* power to resume use of the marks, and immediately took steps to do so. The receiver testified that upon appointment, he investigated the assets of the company, determined that the trademarks were of significant value, and decided that the most profitable course of action would be to sell the company as an on-going concern. Cognizant of the receiver's power to dispose of Marine's assets, including the trademarks, DiDonato engaged in negotiations with the receiver, which ultimately were unsuccessful.

Despite the obvious power of the receiver to dispose of Marine's assets, and despite DiDonato's tacit recognition of that power by negotiating with the receiver to buy the Egg Harbor marks, defendants now argue that, because the appointment of the receiver came one year after Marine's closure, the trademark had fallen into disuse, and thereby dissipated the goodwill associated with the Egg Harbor mark. As the Court understands it, the gravamen of this argument is that the one-year lag between the commencement of the receivership action and the appointment of the receiver contributed to evidence of abandonment and left the receiver with no intellectual property to dispose of. Because the receivership commenced a mere two weeks after the factory closing, the public, including DiDonato, was placed on notice to communicate any interest in the matter through the receivership proceeding.

Although it was the major creditor, NJEDA, which took the laboring oar of mustering assets for eventual sale, it is a commercial reality that such efforts may precede the formal appointment of the receiver. NJEDA's efforts were active and persistent in protecting these assets, conserving them for their eventual sale by the appointed receiver. If a valuable trademark could be held to be abandoned during the very time period of a year when the trademark owner's assets are being conserved by receivership, then the receivership would be denied its most impressive asset merely because the receivership was not commenced and concluded on the day the factory closed, an obvious impossibility.

■ Trademark law does not compel the harsh result of forfeiture absent clear and convincing evidence that there was no intent to resume· use within a reasonable amount of time by any interested creditor with the power to resume such use. The intent to resume use extends over a reasonable period of time—here, the time to file the receivership, appoint a receiver, muster all assets, negotiate with all would-be buyers, and obtain court approval of the sale. Where, as in the present case, this whole process consumed less than two years ending with Trocki's purchase, the length of temporary disuse is not unreasonable and will not be the basis of abandonment.

■ Nor can defendants show that the trademarks were abandoned based on total loss of Egg Harbor's goodwill. While it is true that abandonment may be shown by establishing that the buying public no longer associates the trademark with a certain company, the facts in this case do

not support such a finding. As explained in a leading treatise on trademark infringement, if the good will built up by the mark has so declined that the mark is "no longer associated with the business, in the public mind, then the mark should be regarded as abandoned, despite the purely self-serving testimony of the user that he has some vague intention to resume use at some indefinite time in the future." *McCarthy* § 17:13. Here, plaintiff has adduced uncontroverted evidence showing that the goodwill attached to the fifty-year-old Egg Harbor name was alive and well at the time DiDonato began using the name. Egg Harbor boats were continuing to be sold, and the buying public had little information about who the true owner of the trademark was, leading to the conclusion that most of the relevant market was oblivious to the change in ownership, and still associated the EGG HARBOR name with same manufacturer of boats that had been selling such yachts all along. Without more evidence that the market no longer associated Egg Harbor with Marine Acquisitions or its successors in interest, the Court finds that defendants have failed to meet their burden of showing that the one year lag between closure and the appointment of the receiver supports a finding of abandonment.

Therefore, defendants are unlikely to prevail on a loss-of-goodwill theory, or any other abandonment theory, at trial. The Court finds that plaintiff has demonstrated a likelihood of success on the merits, that it is the true owner of the EGG HARBOR mark, and has therefore satisfied the first requirement for preliminary injunctive relief.

### 2. *Irreparable Harm*

The second factor which a court must consider before granting preliminary injunctive relief is the extent to which the movant will suffer irreparable harm if preliminary injunctive relief is denied. "Grounds for irreparable injury include loss of reputation, loss of trade, and loss of goodwill." *Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc.*, 143 F.3d 800, 805 (3d Cir.1998). Irreparable injury can also be based on the likelihood of confusion over trademark. Once the likelihood of confusion caused by trademark infringement has been established, the irreparable injury follows as a matter of course. *Id.*

In this case, plaintiff EH Yacht LLC and defendant Egg Harbor LLC both have valid claims of irreparable harm. Both sides are presently operating as yacht builders under the Egg Harbor flag, thus leading to inevitable confusion in the marketplace over who is the rightful owner of the Egg Harbor mark. Indeed, both boat makers are scheduled to appear at the National Marine Manufacturers Association boat show, in Miami, Fla., one month hence, and the resulting confusion has led to the possibility that one or both companies will be removed from the show.

Irreparable harm is further evident from the present confusion of the Egg Harbor post office over should receive mails addressed to "Egg Harbor Yacht Co." Without its mail, neither company can effectively communicate with fellow trade professionals, customers, and associates. The resulting loss of goodwill, trade, and damage to reputation constitutes irreparable harm as a matter of law. The abundance of irreparable harm present in this case therefore supports preliminary injunctive relief.

Further, plaintiff has demonstrated that defendants have sewn seeds of confusion by claiming to have "become the owner of Egg Harbor" hoping "to steer the company back to the top," as mentioned above. DiDonato's website boasts are misleading at best, and more probably false. "The company" was conserved, and its assets sold largely as an on-going economic entity to Trocki, not DiDonato. Trocki's court-approved purchase made him the successor to the Egg Harbor assets. DiDonato's assertions about being at the helm of the

old Egg Harbor entity are unsupportable. Unless defendants are enjoined from doing so, this Court finds defendants' misleading statements about the ownership of the trademarks will cause continued harm to the plaintiff.

### 3. Balance of Hardships

The third requirement to be examined before a court may issue a preliminary injunction is the balance of hardships. If the balance of hardships is even or weighs in favor of the movant, then the status quo would be best served by the issuance of an injunction. "The basic purpose behind the balancing analysis is to ensure that the issuance of an injunction would not harm the infringer more than a denial would harm the mark's owner." *Opticians of Ass'n of America v. Independent Opticians of America,* 920 F.2d 187, 197 (3d Cir.1990).

Here, it is likely that both parties will suffer significant hardship should the Court rule in favor of an injunction enjoining them from use of the Egg Harbor name. Both parties have invested substantial money and time into their yacht-building ventures, and a denial of right to use the Egg Harbor mark will undermine much of that effort. However, it is also true that a party cannot claim hardship caused by difficulties it brought upon itself. *Id.; see also Ideal Indus., Inc. v. Gardner Bender, Inc.,* 612 F.2d 1018, 1026 (7th Cir.1979) ("One entering a field occupied by another has a duty to select a trademark that will avoid confusion").

Both parties are in some respects responsible for the hardship they would suffer as a result of an injunction. When buying Marine's assets from the receiver, Dr. Trocki specifically agreed to buy all assets, including intellectual property rights, "as is". Thus, an argument can be made that Dr. Trocki invited the hardship of a preliminary injunction by buying a

lawsuit. Conversely, when beginning his Egg Harbor LLC venture, DiDonato made the choice to adopt an established trademark, the ownership of which was, at best, unclear. Further, DiDonato can be said to have wilfully incurred the harm of an injunction when he made the decision not to purchase Marine's assets from the receiver Mr. Weiss. DiDonato negotiated with the receiver in good faith, but in the end chose not to accept Mr. Weiss's terms. Having made this choice, defendants must abide by the receiver's decision to sell the Egg Harbor name to Dr. Trocki. Further, enjoining defendants from using a name and trademark for which it paid no consideration and which it has only very recently begun to use deprives defendants of relatively little. Like any new company, it must earn its goodwill and is not permitted to appropriate to itself the goodwill of another. An injunction will not bar defendants from continuing to manufacture luxury yachts, so long as defendants do not continue to use the EGG HARBOR trademarks or any variant thereof, or any other name and mark likely to cause confusion with plaintiff's trademarks. These considerations, coupled with what seems to be an almost equal balance of hardships, lead to the conclusion that the grant of an injunction in favor of EH Yacht LLC would do no greater harm to Egg Harbor LLC than would be imposed upon EH Yacht by the denial of an injunction.

### 4. Public Interest

The final consideration in the preliminary injunction analysis is whether the issuance of an injunction furthers the public interest. The public interest in trademark cases is most often described as the right of the public not to be deceived or confused. *Opticians Ass'n,* 920 F.2d at 197. Having already determined that there is a likelihood of confusion created by the concurrent use of the Egg Harbor marks, it follows that if such use continues,

the public interest would be damaged. *See Id.* at 198.

The issuance of an injunction against Egg Harbor LLC will prevent that company from using the mark in any way. Thus, the injunction will prevent the confusion caused by Egg Harbor LLC's present infringement of EH Yacht's owned trademarks. On the other hand, to deny injunctive relief would perpetuate this confusion, and would allow the public's deception to continue unabated. The elimination of confusion that will result from the issuance of an injunction mandates a finding that the public's interest would be best served by the issuance of preliminary injunctive relief in favor of plaintiff EH Yacht LLC.

## III. *CONCLUSION*

For the reasons discussed above, plaintiff EH Yacht's motion for preliminary injunctive relief will be granted and defendants' motion will be denied. The Court will enter the accompanying Order on these cross-motions, which will preliminarily enjoin Egg Harbor LLC, its owners, officers, directors, servants, employees, agents, successors, assigns, and those controlled by and acting in concert with them, as well as the remainder of the individually named defendants and their representatives, from using the EGG HARBOR marks or any variant thereof or any other name and mark likely to cause confusion with plaintiff's trademarks in the advertising, distribution, promotion or sale of goods or services pending further proceedings.

The Court will convene a hearing to determine the amount of bond which plaintiff must post to secure injunctive relief pursuant to Rule 65(c), Fed.R.Civ.P.,[7] on

Thursday, January 13, 2000 at 3:00 p.m. This preliminary injunction shall be temporarily stayed until the plaintiff posts such security as is required as a result of the Rule 65(c) hearing.

## ORDER DENYING DEFENDANTS' MOTION FOR PRELIMINARY INJUNCTION AND GRANTING PLAINTIFF'S CROSS–MOTION FOR PRELIMINARY INJUNCTION

THIS MATTER having come before the court upon the parties' cross-motions preliminary injunction enjoining the other from using the Egg Harbor trademarks in connection with the marketing and sale of luxury sports fishing yachts; and

The Court having considered the submissions of the parties, including affidavits and documentary evidence, and having heard arguments of counsel on said motion on December 13, 1999,

**THE COURT HEREBY FINDS**, for the reasons expressed on the Opinion of this date **THAT:**

1. Plaintiff EH Yacht LLC has proven a strong likelihood that it will prevail on the merits of its claims against Egg Harbor LLC; and

2. Plaintiff has proven that it is likely that it will suffer immediate and irreparable harm and that it will be without an adequate remedy at law, if this preliminary injunctive relief is not granted; and

3. Plaintiff EH Yacht has demonstrated that the issuance of a preliminary injunction will not impose more hardship upon defendants than EH

7. Fed.R.Civ.P. 65(c) states:
(c) Security. No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be required of the United States or of an officer or agency thereof.
The provisions of Rule 65.1 apply to a surety upon a bond or undertaking under this rule.

Yacht would suffer if such relief was denied; and

4. The court further finding that a preliminary injunction is in the public interest in reasonably protecting the public's right not to be confused over the competing use of the Egg Harbor mark;

**NOW, THEREFORE,** IT IS, this day of January (6)6D, 2000, hereby **ORDERED** that:

1. To the extent specified herein, plaintiff EH Yacht LLC's motion for preliminary injunction is GRANTED and defendant Egg Harbor LLC's motion for preliminary injunction is DENIED; and

2. Defendants Egg Harbor LLC, John DiDonato and Gigi DiDonato, jointly and severally and all those acting on their behalf or in concert with them are hereby PRELIMINARILY ENJOINED from using the Egg Harbor name, trademarks and any similar name and/or marks or any variant thereof or any other name and mark which confuse or tend to confuse the public with respect to the origin of defendants' products in the market place; and

3. Defendants Egg Harbor LLC Egg Harbor LLC, John DiDonato and Gigi DiDonato, and all those acting on their behalf or in concert with them are hereby ENJOINED from holding themselves out as the rightful owner(s) of the Egg Harbor name and trademark, and/or as the successor in business interest or name to Marine Acquisitions, Inc. t/a Egg Harbor Yacht Co.; and

4. Defendants Egg Harbor LLC, John DiDonato and Gigi DiDonato, and all those acting on their behalf are hereby ENJOINED from interfering with interfering with the business of EH Yacht LLC in any way, including attempting to intercept or prevent delivery of mail addressed to EH Yacht LLC, Egg Harbor Yacht Co., or any boat manufacturing entity associated with the name Egg Harbor; and

5. This Order shall be temporarily stayed and shall become effective as of the plaintiff's posting of a bond, pursuant to Rule 65(c), Fed.R.Civ.P., for the payment of such costs and damages as may be incurred or suffered by Egg Harbor LLC if it is judicially determined that it has been wrongfully enjoined or restrained. If the parties are unable to agree upon the amount of such bond, all parties shall appear before this Court on Thursday, January 13, at 3:00 p.m., for a determination of appropriate security to be posted pending further proceedings in this matter.