**INTERSTATE NET BANK, Plaintiff,**

v.

**NETB@NK, INC. and Netb@nk,
Defendants.**

**CIVIL NO. 01–1324(JBS).**

United States District Court,
D. New Jersey.

Sept. 16, 2002.

Maureen C. Shay, Fox, Rothschild, O'Brien & Frankel, LLP, Voorhees, NJ, and Carl Poplar, Poplar & Eastlack, PC, Turnersville, NJ, for Plaintiff.

John Levy, Montgomery, McCracken, Walker & Rhoads, LLP, Cherry Hill, NJ, and Elizabeth Ann Morgan, Powell, Goldstein, Frazer & Murphy, LLP, Atlanta, GA, for Defendants.

## OPINION

SIMANDLE, District Judge.

This matter comes before the Court upon motion by plaintiff *inter* State Net Bank for summary judgment against defendants NETB@NK, INC., and NETB@NK (now known as NetBank, Inc., and NetBank, respectively, and referred to collectively herein as "Defendants"). Plaintiff filed the underlying action on March 20, 2001, seeking a declaratory judgment that the term NETBANK (the federal registration of which had been acquired by defendants) is generic and merely descriptive, that plaintiff's use is not likely to cause confusion, and that defendant's trademark registration should be canceled. Defendants have asserted counterclaims for trademark infringement, false designation of origin, false advertising, trademark dilution, and cyber piracy under the Lanham Act; declaratory judgment; and trademark infringement, trademark dilution, and unfair competition under New Jersey law.

On April 12, 2002, plaintiff filed this motion for summary judgment, arguing that the term NETBANK is generic either for the services identified in the registration—online bill payment—or for the broader area of online banking and financial services, and therefore that defendant is neither entitled to incontestible registration nor trademark protection. Plaintiff also seeks attorney's fees under the Lanham Act. On June 10, 2002, this Court heard oral argument on the motion. For the reasons discussed below, plaintiff's motion for summary judgment will be granted.

## BACKGROUND

This case involves the issue of whether defendants' use of the term NETBANK is a generic use and therefore not protectable under the trademark laws. Plaintiff and defendants are among a growing number of internet banks offering their services to customers primarily or exclusively over the internet. On July 13, 1994, Software Agents, Inc., a company unrelated to defendants, filed an application to register NETBANK as a service mark to the United States Patent and Trademark Office ("PTO"), claiming date of first use in commerce of May 26, 1994. (Shay Cert. Ex. A.) In its application, Software Agents had described its services as an "automated payment service which allows exchange of payment coupons via electronic mail." (Shay Cert. ¶ 2 & Ex. A.) On August 22, 1995, the PTO granted Software Agents's

application for registration of the service mark NETBANK, Registration No. 1,913,-750. (*Id.*) The NETBANK mark was registered by the PTO to be used for the following purpose: "electronic payment services featuring a system of electronic money coupons that are exchanged by means of an on-line computer service, in class 36." (*Id.*)

Defendant Net.B@nk, Inc., originally began as Internet Organizing Group, Inc., in October 1996, as a provider of online bill payment services and online statement services for Atlanta Internet Bank, which operated as a division of Carolina First Corporation. (Stokes Decl. ¶ 3.) Internet Organizing Group formally changed its name to Net.B@nk, Inc., in November 1996. (*Id.*) In spring of 1997, Net.B@nk, Inc., acquired a charter for a federal savings bank and assumed control of operations of Atlanta Internet Bank ("AIB") from Carolina First, and continued to provide online bill payment services for AIB. (*Id.* ¶ 4.) A year later, in 1998, Net.B@nk, Inc., contacted Software Agents, which owned the service mark registration for NETBANK and the domain name "netbank.com." (*Id.* ¶ 5.)

On April 9, 1998, Net.B@nk, Inc., acquired the service mark registration for NETBANK and all associated goodwill from Software Agents. (*Id.* ¶ 5.) In July 1998, Net.B@nk, Inc., changed the name of its bank from Atlanta Internet Bank to Net.B@nk, consistent with the corporate name as well as its "full line of banking services." (*Id.* ¶ 6.) Net.B@nk, Inc. and Net.B@nk thus provided both online bill payment services and broader banking and financial services under the NETBANK mark. (*Id.* ¶ 7.)

On July 31, 1998, Net.B@nk filed three "Intent to Use" applications to the PTO to register Net.B@nk as a service mark for "providing retail banking services over the internet." (Shay Cert. ¶ 7 & Ex. F.) In August 1999, the PTO refused registration of the mark on the ground that the mark was confusingly similar to the NETBANK mark, Registration No. 1,913,750, previously registered by Software Agents, Inc., and subsequently assigned to the applicant. (*Id.*) Because there was also a prior pending application for the term NET BANKING, the application was suspended pending disposition of the other application. (*Id.*) The PTO subsequently issued a final refusal to register NET BANKING, and the application was abandoned. (Shay Cert. ¶ 8 & Ex. G.)

On August 22, 2000, NetB@nk, Inc., filed a Combined Declaration of Use and Incontestibility for the original NETBANK registration acquired from Software Agents, Inc., in April 1998, which was accepted by the PTO in 2000. (Shay Cert. ¶ 2 & Ex. A; Defs.' Statement of Material Facts, ¶ 2.) In support of their incontestibility, defendants submitted printouts from their website showing NetBank's "Online Bill Payment and Presentment" Sservice. (Shay Cert. Ex. A; Defs.' Statement of Material Facts, ¶ 3.) Defendants stated in their declaration that "[t]he owner has used the mark in commerce for five (5) consecutive years after the date of registration ... and is still using the mark in commerce on or in connection with all goods and/or services listed in the existing registration." (*Id.*)

Defendants formally changed their names to NetBank, Inc. and NetBank in 2000, due to the practical difficulties in using the "dot" and the @ symbols. (Stokes Decl. ¶ 7.) On or about December 4, 2000, NetBank, Inc. withdrew its application for trademark registration for the mark Net.B@nk to the PTO. (Shay Cert. ¶ 7 & Ex. F.) On December 5, 2000, NetBank, Inc. filed an application to register the term NETBANK NETWORTH INVESTMENT ACCOUNT for "providing

comprehensive banking and investment brokerage services over a global computer network." (Shay Cert. ¶ 9 & Ex. H.) On June 28, 2001, the PTO refused to register the mark, noting:

> The applicant must disclaim the descriptive wording "NETBANK" and "IN-VESTMENT ACCOUNT" apart from the mark shown.... The wording is merely descriptive because it describes the method of delivering the services (NETBANK) and a feature of the services (INVESTMENT ACCOUNT).

(Shay Cert. ¶ 9 & Ex. H.)

On March 15, 2001, plaintiff *inter* State Net Bank received its banking charter from the State of New Jersey and began operations in June 2001, conducting a portion of its business over the internet through its website interstatenetbank.com. Plaintiff filed two "Intent to Use" applications in late 1999 and early 2000 for the mark INTERSTATE NET BANK for "banking services provided via the global computer network," and applied for a New Jersey State Banking Charter for INTERSTATE NET BANK in July 2000. On September 8, 2000, defendants served plaintiff a cease and desist letter regarding its use of INTERSTATE NET BANK or "any other moniker confusingly similar to the NETBANK marks...." (Grout Letter, Shay Cert. ¶ 11 & Ex. J.) By letter dated September 18, 2000, plaintiff refused to accede to defendants' demands. (Fall Letter, Shay Cert. ¶ 12 & Ex. K.) In a letter dated November 2, 2000, defendants threatened to bring suit against plaintiff. (Grout Letter, Shay Cert. ¶ 13 & Ex. L.)

On March 20, 2001, plaintiff filed this action seeking a declaratory judgment that NETBANK is generic and merely descrip-

tive, that plaintiff's use is not likely to cause confusion, and that defendant's trademark registration should be cancelled. (Compl. ¶¶ 21–27.) On August 1, 2001, defendant submitted its answer and counterclaims alleging trademark infringement, false designation of origin, false advertising, trademark dilution, and cyberpiracy under the Lanham Act; declaratory judgment; and trademark infringement, trademark dilution, and unfair competition under New Jersey law. (Answer & Counterclaims, ¶¶ 32–124.) Pursuant to the Scheduling Order of September 24, 2001, all discovery was complete before plaintiff filed this summary judgment motion asserting that the term NETBANK is generic on April 12, 2002.

### DISCUSSION

I. *Plaintiff's Motion for Summary Judgment*

■ Plaintiff maintains that the term NETBANK [1] is generic and should be given no protection under the trademark laws. Defendants argue, however, that this determination cannot be decided on a summary judgment motion. "Whether or not a particular trademark is generic is a question of fact." *Salton Inc. v. Cornwall Corp.,* 477 F.Supp. 975, 986 (D.N.J.1979) (citation omitted). In approaching the determination of genericness, "as with any question of fact [it] can be resolved on summary judgment if the evidence is so one-sided that there can be no doubt about how the question should be answered." *Door Sys., Inc. v. Pro–Line Door Sys., Inc.,* 83 F.3d 169, 171 (7th Cir.1996) (Posner, C.J.) (citing *Bath & Body Works, Inc. v. Luzier Personalized Cosmetics, Inc.,* 76

---

**1.** The terms NETBANK and NET BANK are used interchangeably herein, insofar as the ultimate dispute involves whether defendants' registration of NETBANK is generic, and/or whether plaintiff's use of NET BANK in-

fringes on that registration. Furthermore, the terms may be in non-capitalized form, especially when discussing usage in dictionaries and articles.

F.3d 743, 748 (6th Cir.1996); *Boston Beer Co. v. Slesar Bros. Brewing Co.*, 9 F.3d 175, 180 (1st Cir.1993); *see, e.g., America Online, Inc. v. AT & T Corp.*, 243 F.3d 812, 818–23 (4th Cir.) (affirming district court's summary judgment finding of genericness as to "You Have Mail" and "IM," but reversing as to "Buddy List"), cert. dismissed, —— U.S. ——, 122 S.Ct. 388, 151 L.Ed.2d 256 (2001); *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 938–41 (7th Cir.1986) (affirming district court's summary judgment finding that term "liquid controls" is generic); *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1150–52 (9th Cir.1999) (affirming district court's summary judgment finding that "Filipinio Yellow Pages" is generic); *Convenient Food Mart, Inc. v. 6–Twelve Convenient Mart, Inc.*, 690 F.Supp. 1457, 1461 (D.Md.1988) ("[T]he genericness issue is ripe for resolution on summary judgment despite the lack of survey evidence."), *aff'd*, 870 F.2d 654, 1989 WL 21392 (4th Cir.1989). Thus, if the undisputed facts show that there is no genuine issue as to any material fact regarding the genericness of the mark, this Court may appropriately decide such a question on summary judgment.

### A. *Whether the NETBANK Mark is Generic*

Plaintiff argues that the term NETBANK is generic and as such is incapable of trademark protection, and seeks to have defendant's registration of the term canceled,[2] as well as an award of attorneys' fees. Courts have recognized four different categories of terms with respect to trademark protection: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *See A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 297 (3d Cir.1986) (citation omitted); *Filipino Yellow Pages, supra*, 198 F.3d at 1146–47 (citing *Surgicenters of America, Inc. v. Med. Dental Surgeries Co.*, 601 F.2d 1011, 1014 (9th Cir.1979)). A generic or common descriptive term can never function as a trademark, and merely specifies the genus of which the particular product is a species. *See Liquid Controls, supra*, 802 F.2d at 935–36 (affirming district court's finding that "liquid controls" is a generic term) (citations omitted); *see also In re Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 828 F.2d 1567, 1569 (Fed.Cir.1987) ("Generic terms, by definition incapable of indicating source, are the antithesis of trademarks, and can never attain trademark status."); *Filipino Yellow Pages*, 198 F.3d at 1147 (a generic term "cannot become a trademark under any circumstances"). A generic term is never protectable because "even complete 'success . . . in securing public identification . . . cannot deprive competing manufacturers of the product of the right to call an article by its name.'" *Canfield*, 808 F.2d at 297 (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976)).

■ Defendants in turn rely on their acquisition of the federal trademark registration of the term NETBANK, which it obtained from Software Agents on April 9, 1998. If a party has a federal trademark

---

**2.** Plaintiff seeks to cancel defendant's registration of the NETBANK mark under 15 U.S.C. § 1064:

A petition to cancel a registration of a mark, stating the grounds relied upon, may . . . be filed as follows by any person who believes that he is or will be damaged . . . [a]t any time if the registered mark becomes the generic name for the goods or services . . . for which it is registered, or is functional, or has been abandoned, . . . or if the registered mark is being used by, or with the permission of, the registrant so as to misrepresent the source of the goods or services on or in connection with which the mark is used. . . .

15 U.S.C. § 1064.

registration, it constitutes a strong presumption that the term is not generic or descriptive. *See* 15 U.S.C. § 1115(a); *see also Liquid Controls,* 802 F.2d at 936; *Horizon Mills Corp. v. QVC, Inc.,* 161 F.Supp.2d 208, 214 (S.D.N.Y.2001). The Lanham Act provides:

> [A] mark registered on the principal register ... shall be *prima facie evidence* of registrant's exclusive right to use the registered mark in commerce on the goods or services specified in the registration subject to any conditions or limitations stated therein, but shall not preclude an opposing party from proving any legal or equitable defense or defect which might have been asserted if such mark had not been registered.

15 U.S.C. § 1115(a) (emphasis added). The "registration constitutes prima facie evidence of a protected interest with respect to the *goods specified in the registration only.*" *Levi Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352, 1354 (9th Cir. 1985) (*en banc*) (emphasis added); *see also Novartis Consumer Health, Inc. v. McNeil–PPC, Inc.,* 53 U.S.P.Q.2d 1406, 1409 (D.N.J.1999) (quoting 15 U.S.C. § 1057(b)). This presumption may be overcome by proof of descriptiveness or by proof of genericness, and the burden is on the opposing party, here the plaintiff, to overcome the presumption. *Liquid Controls,* 802 F.2d at 936. Prior to examining whether the term NETBANK is generic, defendant's entitlements to any presumptions will now be discussed.

### 1. *Whether Defendant Has a Protected Interest*

The registration of the NETBANK service mark in 1995 was approved for a rather narrow scope of services: "electronic payment services featuring a system of electronic money coupons that are exchanged by means of an on-line computer service, in class 36," *supra.* Plaintiff contends that the presumption conferred to defendants by their federal trademark registration of NETBANK extends only to defendants' use in connection with the goods or services specified in the registration. *See Levi Strauss,* 778 F.2d at 1354; *Trustees of Columbia Univ. v. Columbia /HCA Healthcare Corp.,* 964 F.Supp. 733, 742 (S.D.N.Y.1997). In *Levi Strauss,* plaintiff alleged that defendant's use of a horizontal tab on the pockets of its shirts bearing the name "Wrangler" or "Maverick" violated plaintiff's federal registration of its pocket tab mark, which was described as "a small marker or tab of textile material or the like, colored red." *Levi Strauss,* 778 F.2d at 1354. While the goods for which plaintiff had originally registered their use were patch pocket overalls, Strauss later obtained registration of other tabs in other colors, for use with jackets and trousers. In determining the merits of plaintiff's trademark infringement claim, the Ninth Circuit stated that "Strauss cannot simply rely on the federal registration of certain tabs, most notably of those on pants, to establish a protected interest in a pocket tab on garments generally, because registration constitutes prima facie evidence of a protected interest with respect to *the goods specified in the registration only.*" *Id.* at 1354. After examining whether plaintiff had a protected interest, the first element of its cause of action, under the doctrine of secondary meaning, the Ninth Circuit affirmed the district court's summary judgment decision in favor of defendant on the federal trademark infringement claim.

Similarly, in *Columbia University,* plaintiff had obtained federal service mark protection for the name "Columbia University" for educational services, and claimed that its use of the mark "Columbia," alone and in combination with other words and phrases, was entitled to protection in the field of medical or healthcare services. Following a non-jury trial, the district

court held that plaintiff was not entitled to a presumption of an exclusive right to use the Columbia mark in connection with medical or healthcare services because "the presumption of an exclusive right to use a registered mark extends only to the goods and services noted in a registration certificate." *Columbia Univ.*, 964 F.Supp. at 742. In that case, where plaintiff did not own any federal trademark registration for the Columbia mark, the mark was deemed not registered, and the district court analyzed whether plaintiff had a valid trademark.

█ In this case, Software Agents, Inc., registered the NETBANK mark in 1995 to be used for the following purpose: "electronic payment services featuring a system of electronic money coupons that are exchanged by means of an on-line computer service." Defendants, as a company that acquired a charter for a federal savings bank in 1997 and that subsequently approached Software Agents to acquire the NETBANK service mark in April 1998, has used the NETBANK mark in connection with providing both online banking services and online bill payment services to customers since at least 1998. *See* Stokes Decl. ¶ 6. Defendants' use of the federally registered mark in connection with their banking services expands the scope of use that the original registrant, who had provided an online bill payment service, had initially sought and for which the trademark protection was granted. Under the cases cited, defendants' use of the registered term does not entitle it to a presumption of an exclusive right because their use of NETBANK is not in connection with the services originally specified in the registration form.

Plaintiff argues further that incontestability of the mark, as defendant maintains, also applies only to the goods or services for which the mark was originally registered. *See In re Merrill Lynch*, 828

F.2d at 1568. In *Merrill Lynch*, the PTO, acting through the Trademark Trial and Appeal Board, refused registration of the term "CASH MANAGEMENT ACCOUNT" as a service mark for "stock brokerage services, administration of money market fund services, and providing loans against securities services," holding that the term was a common descriptive or generic name for these financial services. Appellant had already had a registration for the term as a service mark for "financial services involving the use of plastic credit cards by the cardholders for loans to cardholders from their brokerage equity account," and asserted that its incontestable right to use the term CASH MANAGEMENT ACCOUNT included the right to register that term for similar services in a subsequent application. Although the Federal Circuit reversed and remanded only as to the Board's finding regarding genericness of the proposed trademark, it affirmed the Board's holding that "appellant's incontestable registration for specific services involving credit cards did not automatically entitle appellant to a registration for broader financial services." *In re Merrill Lynch*, 828 F.2d at 1568. The court elaborated on one's entitlements regarding incontestability under § 1115(b):

> The benefits of incontestability are no more than that "the registration shall be conclusive evidence of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. § 1115(b). The only thing that becomes incontestable is the right of the registrant to use the mark for the *goods or services for which it is registered.* Even that right is subject to the defenses enumerated in 15 U.S.C. § 1115(b) and to the grounds for cancellation set forth at 15 U.S.C. § 1064(c) and (e).

*In re Merrill Lynch,* 828 F.2d at 1568 (emphasis added).

■ In the instant matter, defendant's claim that its mark is incontestable can apply as a matter of law only in connection with goods and services for which the mark was originally registered. Because defendant's mark was registered in connection with "electronic payment services featuring a system of electronic money coupons that are exchanged by means of on-line computer service," and not internet banking services, the incontestability of the mark does not apply to defendants' use of the term in connection with their current provision of internet banking services.

Defendants claim in response that a mark can protect services beyond those identified in its registration under the "natural expansion" doctrine, citing to *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1201 (11th Cir.2001), and *Carnival Brand Seafood Co. v. Carnival Brands, Inc.*, 187 F.3d 1307, 1312 (11th Cir.1999) (reversing district court's grant of summary judgment because fact issues remained regarding whether it was natural for plaintiff to expand "Carnival" mark from shrimp products to gumbo products and other seafood products). Under the "natural expansion" doctrine,

> The senior user's rights may extend into uses in "related" goods or service markets .... Thus, an owner of a common law trademark may use its mark on related products or services and may enjoin a junior user's use of the mark on such related uses. The doctrine gives the trademark owner protection against the use of its mark on any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner.

*Carnival*, 187 F.3d at 1310 (citing *Tally–Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1023 (11th Cir.1989)).

The Eleventh Circuit in *Planetary Motion* determined that, under natural expansion, where another user intervened, plaintiff's scope of trademark protection extended from the initial use of the "Cool-Mail" mark with computer software that provides e-mail users with notice of new e-mail and service as a gateway to the users' e-mail application, to its current use providing e-mail notification and other services via telephone. Because the case involved an intervening use of the "Cool-Mail" mark by defendant, a competing e-mail provider, the court applied the "source or sponsorship" test and found that plaintiff's mark as subsequently used by defendant would cause the buying public to believe the product came from, or was affiliated with, plaintiff. The Eleventh Circuit thus affirmed the district court's finding of likelihood of confusion under the Lanham Act.

■ The natural expansion doctrine is likely inapplicable to defendants because they are not the same entity that registered the mark NETBANK, although they later acquired the registration. If they were the original entity, and a junior use intervened on that use, the issue would be whether defendants' use of the trademark could reasonably extend to services that naturally expanded from the original use of the trademark in connection with the provision of online payment services. Even if the doctrine were applicable, defendants have not demonstrated how a reasonable factfinder could determine that banking services naturally flows from the original scope of bill payment services using electronic coupons, which were not even specified as banking-related in the registration application for the mark NETBANK.

This Court is not persuaded that any reasonable factfinder could determine that defendants' proposed expansion was com-

prehended by the previously registered use of NETBANK for online bill payment services using electronic coupons under the "related goods" doctrine. The Eleventh Circuit discussed the scope of "related goods" in the context of business expansion:

> [A] trademark owner cannot by the normal expansion of its business extend the use or registration of its mark to *distinctly different goods or services not comprehended by its previous use* ... where the result could be a conflict with valuable intervening rights established by another through extensive use ... of the same or similar mark for like or similar goods and services.

*Carnival,* 187 F.3d at 1310–11 (citing *American Stock Exch., Inc. v. American Express Co.,* 207 U.S.P.Q. 356, 364 (Treademark Tr. & App. Bd.1980)) (emphasis added). *See, e.g., Physicians Formula Cosmetics, Inc. v. West Cabot Cosmetics, Inc.,* 857 F.2d 80, 82 n. 1 (2d Cir.1988). In *Physicians Formula Cosmetics,* the Second Circuit agreed with the district court that defendant's prior use of the trademark "Physicians & Surgeons" on hard-bar soaps did not entitle the company to extend the use of the mark to skin creams and lotions. Hard-bar soaps were the only product marketed with the trademark from 1888 to 1981, when the company began applying it to its cream and lotion products. The company could not avail itself of this business expansion doctrine, and its competitor thus had the right to use the mark "Physicians Formula" for its creams and lotions.

In this case, the trademark had originally been promoted in connection with an online bill payment service using electronic coupons since its application for registration in July 1994 and subsequent approval in August 1995. There is no evidence indicating that, at that time, it was anticipated that such services would be expanded to include internet banking services. It appears that only in 1998 when defendants changed their names to Net.B@nk, Inc. and Net.B@nk and acquired the mark from Software Agents did they begin providing services of both online bill payment and online banking and financial services. Furthermore, there is no evidence indicating that internet banking services had been contemplated as an industry at all at the time of the mark's application.

The origins of net banking have been well-documented in the present motion practice. The facts regarding these developments are not in dispute. The first article chronicling the subsequent emergence of Security First Network Bank ("SFNB") as the first internet bank in June 1995, eleven months after the registration application, strongly suggests this. The term "net bank" appeared as early as June 1995, in connection with SFNB, the first Internet bank, and the beginning of the online banking industry. *See* Pl.'s App. of Articles ("App.") 1–3. As for defendants, they were incorporated as Internet Organizing Group in 1996, commenced operations under the name Atlanta Internet Bank ("AIB"), and sought and acquired the NETBANK trademark registration in 1998 from Software Agents, attempting to use it in connection with online retail banking at that time. Defendants' bank AIB, which opened for business on October 18, 1996, is often referred to as the second net bank in existence. *Id.* at 2–1 to 2–5. Innumerable references to online banking services as "net banks" in publications easily accessible by the general public existed and continued to increase. *See id. et seq.* Defendants undoubtedly knew of the use of "net bank," for not just its own bank but also for SFNB in connection with the provision of internet banking services, as well as numerous other references in the media and literature, by the time it sought the NETBANK trademark from

Software Agents in 1998 and attempted to register terms such as NET BANKING and NET.B@NK as service marks for providing online banking services in 1998, requests which the PTO refused. As was the case in *Physicians Formula Cosmetics,* defendants attempt to "reap[ ] the harvest which others have sown," 857 F.2d at 82 n. 1, and the equities here likewise do not favor expansion of the NETBANK trademark to extend to online banking services.

Because defendants' use of the NET-BANK mark is in connection with online banking services, not with online bill payment services using electronic coupons as originally registered, defendants are not entitled to a presumption of a protected interest in the mark flowing from the earlier narrowly defined registration. In addition, based upon the uncontested facts cited above, the natural expansion doctrine is inapplicable to defendants and fails to support expansion of trademark protection to defendants' current services.

### 2. *Genericness Under the Primary Significance Test*

■ Plaintiff asserts that the NET-BANK mark has become generic under the "primary significance" test under 15 U.S.C. § 1064:

> A registered mark shall not be deemed to be the generic name of goods or services solely because such mark is also used as a name of or to identify a unique product or service. *The primary significance of the registered mark* to the relevant public rather than the purchaser motivation *shall be the test for determining whether the registered mark has become the generic name* of goods or services on or in connection with which it has been used.

15 U.S.C. § 1064(3); *see also Bayer Co. v. United Drug Co.,* 272 F. 505, 509 (S.D.N.Y. 1921) (Hand, J.) ("The single question . . .

in all these [genericness] cases, is merely one of fact: What do the buyers understand by the word for whose use the parties are contending?"). The primary significance test, the dominant principle for determining whether a term is generic, was originated by the Supreme Court case of *Kellogg Co. v. Nat'l Biscuit Co.,* 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73, *reh'g denied,* 305 U.S. 674, 59 S.Ct. 246, 83 L.Ed. 437 (1938), the holding of which was codified by Congress in the Trademark Clarification Act of 1984, Pub.L. No. 98–620, Title I, § 102, 98 Stat. 3335 (codified at 15 U.S.C. § 1064). *See Canfield,* 808 F.2d at 299 (determining that designation "chocolate fudge" was generic and unprotectable). The Third Circuit, citing the Senate Report on the Clarification Act, provided explication of this test:

> The important question is whether the primary significance of the term to the relevant consuming public is to identify a product which emanates from a single, albeit anonymous source, or merely to identify the product itself. Of course, *if the public primarily understands the term as identifying a product, rather than a product emanating from a particular, albeit anonymous, source, the term is generic.*

*Id.* at 301 (citing Senate Report, at 8–9, U.S.C. Cong. & Admin.News 1984, at 5725 (citing *Kellogg* )). The primary significance test, which instructs courts to inquire whether a term primarily signifies the product or the producer, is met even if the primary significance of the mark is not directly the producer but rather if "the primary significance of the mark to consumers . . . is to identify a product or service which emanates from a particular source, known or unknown, for it still provides the assurance to the public that the product is of uniform quality and performance." *Canfield,* 808 F.2d at 300 (citation omitted). The primary significance

test is generally satisfied if a term signifies a product that emanates from a single source, *i.e.*, a product brand, but it is not satisfied if the product that emanates from a single source is not only a product brand but is also a product genus. *See id.* at 301. The Third Circuit established a new rule for determining whether a term is a product brand or a product genus:

> If a producer introduces a product that differs from an established product class in a particular characteristic, and uses a common descriptive term of that characteristic as the name of the product, then the product should be considered its own genus. Whether the term that identifies the product is generic then depends on the competitors' need to use it.

*Id.* at 305–06.

In *Canfield*, the Third Circuit determined whether the term "chocolate fudge" was generic under its newly established test. The Third Circuit, having determined that the relevant product genus was diet sodas that taste like chocolate fudge, then examined the need of plaintiff's competitors to use the term "chocolate fudge," taking into account a factual analysis of alternative terms. The Third Circuit, unable to imagine a term that conveys the same functional information, concluded that the term "chocolate fudge" as applied to diet soda is generic and is available to all potential competitors.

Here, despite defendants' contention that their marks "are famous and distinctive symbols within the internet banking community," Answer & Counterclaim, ¶ 20, plaintiff submits that the term NETBANK was commonly used to signify a new class of banks operating over the internet well before defendants adopted NETBANK as their mark, citing to *WSM, Inc. v. Hilton*, 724 F.2d 1320, 1326 (8th Cir.1984). In *WSM*, the Eighth Circuit considered whether the term "opry" was generic, as the district court had found below. The

Eighth Circuit, examining the historical origins of the word and its dictionary definition, found that the term was in common use before plaintiff registered the mark in 1982, and determined that the district court appropriately applied the buyer understanding test in reaching its conclusion that the term was generic.

In this case, to determine how the term is understood by the consuming public, plaintiff provides dictionary definitions of the two words that make up the term. Webster's Collegiate Dictionary provides that "bank" is defined as "an establishment for the custody, loan, exchange, or issue of money, for the extension of credit, and for facilitating the transmission of funds." Shay Cert. Ex. M. The term "net" is synonymous with and used as an abbreviation of the word "internet." Shay Cert. Ex. N. As plaintiff points out, the Fourth Circuit has deemed the word "internet" a generic term due to its pervasive use. *See America Online, supra*, 243 F.3d at 820–21 (affirming summary judgment decision that "You Have Mail" and "IM" are generic terms, but reversing as to genericness of "Buddy List" because genuine issue of material fact existed as to trademark registration of term). "An abbreviation is treated similarly to its underlying phrase where the abbreviation imparts the original generic or descriptive connotation." *American Historic Racing Motorcycle Ass'n, Ltd. v. Team Obsolete Promotions*, 33 F.Supp.2d 1000, 1004 (M.D.Fl.1998), *aff'd*, 233 F.3d 577 (11th Cir.2000). Here, "net," as an abbreviation of "internet," imparts the meaning of the underlying term and is treated similarly here. *See e.g., Nat'l Conference of Bar Examiners v. Multistate Legal Studies, Inc.*, 692 F.2d 478, 488 (7th Cir.1982) (holding that "Multistate Bar Examination" is not protected and use of "MBE" to designate test "is of no consequence"), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983).

Defendants correctly point out that there is no dictionary definition of the exact term "netbank," and argue that the Court must examine the mark as a whole and not consider its component elements separately. "While not determinative, dictionary definitions are relevant and often persuasive in determining how a term is understood by the consuming public, the ultimate test of whether a trademark is generic." *Surgicenters*, 601 F.2d at 1015 n. 11. In this case, defendants offer the testimony of Professor David Yerkes, Professor of English at Columbia University and an expert in the Engligh language. *See* Yerkes Decl. & Report. Professor Yerkes analyzed dictionary definitions to assess whether "net bank" is generic, and contends that dictionaries' lack of inclusion of the term reflects that it is not a generic term. *See id.* ¶ 13. This Court does not construe the case law to require that the disputed term necessarily be defined in the dictionary to be deemed a generic term, nor could it be argued that terms held to be generic are indeed found as defined terms in the dictionary. *See America Online*, 243 F.3d at 822–23 ("You have mail" is generic); *Filipino Yellow Pages*, 198 F.3d at 1147–48 ("Filipino yellow pages" is generic term); *Nat'l Conference of Bar Examiners v. Multistate Legal Studies, Inc.*, 692 F.2d 478, 488 (7th Cir.1982) ("Multistate Bar Examination" is generic or has common descriptive quality). Although the precise term "net bank" is not found in the dictionary, this fact is not dispositive.

In *Surgicenters*, the Ninth Circuit considered the genericness of the term "surgicenter," placing weight on the dictionary definitions and generic nature of "surgery" and "center." The Ninth Circuit noted that the combination of terms in "surgicenter" did not constitute a deviation from normal usage or an unusual unitary combination. The Ninth Circuit also based its determination of genericness on the 45 exhibits of letters and several publications that, taken collectively, suggested that the consuming public considered the term "surgicenter" to mean a surgical center generally speaking. Like *Surgicenters*, there is ample evidence demonstrating that the public views the term NETBANK to be generic. Here, plaintiff has provided two appendices of literally hundreds of articles from established publications recognized nationwide and internationally, including Money and Fortune magazines and Financial Times (London), indicating that the term "net bank" is used by the public to describe a bank that is located on and accessed via the internet with online services.

In support of the argument that the public uses the term NET BANK to refer not to defendants, but to the service of online banking generally, plaintiff asserts that the term NET BANK was used generically to refer to a new class of banks operating on the internet before the mark was registered by defendant, and has continued to be used generically as the internet banking industry has grown.[3] Plaintiff provides numerous citations from various publications, including the ABA Banking Journal and Business Times, that have used the term "net bank" to refer to an Internet bank. *See* App. 1–2, 1–14, 1–15. Several articles describe the Security First Network Bank, which opened in 1995, as the first "net bank." *See* App. 1–2, 1–14,

---

**3.** Plaintiff also contends that a PTO finding is evidence of genericness, citing to *Filipino Yellow Pages*, 198 F.3d at 1148. That case noted that the Trademark Examiner required a disclaimer as to certain terms in the request for registration. The Trademark Examiner did the same regarding defendant's submission of the "NETBANK NETWORTH INVESTMENT ACCOUNT" term to the PTO for registration, requiring a disclaimer for "NETBANK," to which defendant was apparently unwilling to assent. *See* Shay Cert. Ex. H.

1–15. Several other articles refer to defendants' Atlanta Internet Bank as the "second net bank" to open for business. *See* App. 2–1, 2–2, 2–4. Plaintiff also cites to several articles that use the term "net bank" before defendants acquired the registration of the "NETBANK" term. *See, e.g.,* App. 3–1, 3–2, 3–3, 3–5. Tab 4 of plaintiff's appendix provides several other articles from domestic and international press referring to "net banks" prior to defendant's use of the term.

This Court is of the view that "net bank" is perhaps the most appropriate way to describe a bank or financial institution specializing in banking services that is located on and conducts its business, at least partially, via the internet.[4] Like other generic terms, such as "You have mail," *America Online*, 243 F.3d at 822–23, or "Filipino yellow pages," *Filipino Yellow Pages*, 198 F.3d at 1147–48, the usage of "net bank" falls within the heartland of common meaning and usage, as net is an abbreviation of internet, and bank is likely the only descriptive word to convey an institution that conducts banking services. Thus, defendants cannot exclude others from using these same words in connection with online banking services. As in *Surgicenters*, the

hundreds of articles submitted as exhibits with the phrase "net bank," taken collectively, suggest that, despite the 1995 registration of the term for bill payment services, the consuming public considers the NET BANK term to mean an internet bank generally speaking, and indicates that the term is indeed generic.[5]

■ Defendant alternatively asserts that "NET BANK" is descriptive, not generic. A trademark is descriptive if it immediately conveys knowledge of the ingredients, qualities or characteristics of the product. *See In re Dial–A–Mattress Operating Corp.*, 240 F.3d 1341, 1346 (Fed. Cir.2001) (citing *In re Quik Print Copy Shops, Inc.*, 616 F.2d 523, 525 (Cust. & Pat.App.1980)). A descriptive mark can be registered only if it has acquired secondary meaning. *See In re Dial–A–Mattress*, 240 F.3d at 1347 (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615, *reh'g denied*, 505 U.S. 1244, 113 S.Ct. 20, 120 L.Ed.2d 947 (1992)). To establish secondary meaning or "acquired distinctiveness," an applicant must show that "in the minds of the public, the primary significance of a product feature or term is to identify the

---

**4.** Defendants argue that there are alternative names for the banking services it offers, and thus "NETBANK" is descriptive rather than generic. It offers alternative names for these services, including ANYTIME–ANYWHERE BANK, BRANCH–FREE BANK, BRANCH-LESS BANK, COMPUTER BANK, CYBER-BANK, INTERNET BANK, SMART BANK, and VIRTUAL BANK. *See* Yerkes Report, ¶¶ 23–25, Attach. L. The Court finds that the awkwardness of these alternate phrases reinforces usage among the general public of the more eloquent and catchier phrase "net bank." *See, e.g., Blinded Veterans Ass'n v. Blinded American Veterans Fdtn.*, 872 F.2d 1035, 1041 & n. 13 (D.C.Cir.1989) ("It is difficult to imagine another term of reasonable conciseness and clarity by which the public refers to former members of the armed forces who have lost their vision.").

**5.** Defendants also argue that "netbank" is not generic because the articles do not reference "net bank" as an independent term or phrase, the articles include quotation marks around "NET BANK" or one of its components, other articles show "NET BANK" being used as a proper name, and other articles show that "net" and "bank" have retained their distinct identities as individual words. This Court finds such arguments to hold little weight, in light of the exhibits presenting strong evidence to the contrary, as discussed. In particular, the fact that the individual words retain their own identities is not dispositive of the issue whether the composite term is generic, as it defies logic how a term composed of indistinct and inseparable words should be deemed more likely to be found generic.

*source of the product* rather than the product itself." *In re Dial–A–Mattress,* 240 F.3d at 1347 (citing *Inwood Labs., Inc. v. Ives Labs.,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)) (emphasis added). Defendant relies primarily on Professor Yerkes' report, in which he examined the context of "NET BANK" in all of plaintiff's cited articles and concluded that the articles demonstrate that "NET BANK" is descriptive of a business that provides banking services over the Internet, but is not a generic term in and of itself. *See* Yerkes Report, ¶¶ 14–16. However, defendants point to no evidence that the term NET BANK is distinctive of *only defendants'* goods. *See Surgicenters,* 601 F.2d at 1014 ("A merely 'descriptive' term ... can, by acquiring a secondary meaning, *i.e.,* becoming 'distinctive of the applicant's goods, become a valid trademark."). It has not been demonstrated to any degree that the primary significance of "netbank" has been to identify defendants as the source of the term. Thus, defendants' argument that the term is descriptive fails.

Defendant has also provided a report by Kenneth Hollander, which determined that the term "NetBank" is not considered generic after surveying 400 random internet users and asking them certain questions regarding phrases that describe banking services. Defendant contends that "the best evidence in a genericism inquiry is a consumer survey." Defs.' Br. at 26 (citing *Berner Int'l Corp. v. Mars Sales Co.,* 987 F.2d 975, 982–82 (3d Cir.1993)). The Third Circuit in *Berner* stated not that consumer surveys were the "best evidence" in a genericness question, but that "direct consumer evidence, *e.g.,* consumer surveys and testimony is preferable to indirect forms of evidence. . . . Judges are now used to survey evidence and often expect to receive evidentiary assistance by surveys in resolving generic disputes." *Berner,* 987 F.2d at 982–83.

In this case, the Hollander survey asked, in relevant part:

1. Are you aware of a banking service that allows you to pay some or all of your bills by using your computer to communicate with your bank?

2. If you were to describe this process to a friend, what words or phrases would come to mind first? That is, what would you call this process?

Hollander Report, App. B. The Hollander report indicated that no one responded with the term "net bank" to describe the process of paying bills by using a computer. Considering this survey as one piece of evidence in the genericness inquiry, this Court finds that by posing such survey questions, defendants attempt to confuse the separate industries or services of online banking and online bill payment. Both online bill payment and banking services are combined in the question, defendants having initially occupied the capacity of an online bill payment company while seeking to assert its mark over plaintiff in the field of banking services provided via the global computer network. *See, e.g.,* Grout Letter, 9/8/00, Shay Cert. Ex. J; *see also* Plaintiff's Intent to Use Application. However, the issue is whether "net bank" is generic for online banking services, for which defendants seek to expand their trademark protection, not online bill payment services using electronic coupons, for which the mark was registered. Defendants' attempt to pose questions whether a banking service providing online bill payment services is considered a "net bank" by the general public fails to reach the heart of the issue, which is whether the "net bank" term has reached genericness in the field of banking services provided via the global computer network. Even if the survey does purport to demonstrate that the term is not generic, Mr. Hollander's report does not support the notion

that "NETBANK" identifies defendant as the source of the product, which is required to prove that a term is descriptive and has acquired secondary meaning. Mr. Hollander's survey is not probative of this central issue, and it provides no evidence that the term has acquired a secondary meaning that is distinctive of the defendants' services. In the absence of evidence tending to show that the consuming public has associated "NETBANK" with NetBank, Inc. or NetBank as the source, when contrasted to hundreds of articles using the term in reference to other companies and to generally describe banking services on the internet, no reasonable factfinder could conclude that "NET-BANK" is descriptive with secondary meaning.

For the reasons stated above, the Court concludes that the term "net bank" is generic, and plaintiff's summary judgment motion will be granted on this ground.

## II. *Attorney's Fees*

█ Plaintiff seeks an award of attorneys fees under the Lanham Act. The Lanham Act expressly provides for an award of attorney's fees at the discretion of the court in "exceptional cases." 15 U.S.C. § 1117(a). The Third Circuit has held that an exceptional case under § 35(a) must involve culpable conduct, such as bad faith, fraud, malice, or knowing infringement, on the part of the losing party. *Securacomm Consulting, Inc. v. Securacom Inc.*, 224 F.3d 273, 279–80 (3d Cir. 2000) (citing *Ferrero U.S.A., Inc. v. Ozak Trading, Inc.*, 952 F.2d 44, 47 (3d Cir. 1991)). On the facts of this case, there is no clear showing that defendants acted in bad faith, fraud, or malice in usage of its service mark. The possibility of knowing infringement is especially lacking here because defendants themselves obtained the trademark registration of the NETBANK mark. Accordingly, this situation does not present an exceptional case, and plaintiff's

request for attorney's fees under the Lanham Act will be denied.

## III. *Cancellation of the Registered Mark*

█ Plaintiff also seeks cancellation of the registered service mark. While formal cancellation proceedings are held before the PTO, this Court may also direct the PTO to cancel a mark under 15 U.S.C. § 1119, which provides:

> In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action. Decrees and orders shall be certified by the court to the Director, who shall make appropriate entry upon the records of the Patent and Trademark Office, and shall be controlled thereby.

15 U.S.C. § 1119. Although it is within the purview of the Court to cancel a mark which has, over time, become generic for the specified service for which it was registered, plaintiff here seeks cancellation of the "NETBANK" mark for use in internet banking services, although the term is registered for "electronic payment services featuring a system of electronic money coupons." The mark *as registered* does not apply to these services. Notwithstanding the term's genericness in the field of internet banking services, this Court will decline to cancel the registration of the "NETBANK" mark pursuant to 15 U.S.C. § 1119 due to the term's registration for another use.

## CONCLUSION

Although defendant has acquired the federal mark registration for the term "NETBANK" from Software Agents, it is not entitled to a presumption of a protected interest in the mark because "NET-

BANK" is not currently being used in connection with the goods or services for which it was originally registered. Even if defendants' have a protected interest in the mark and therefore a presumption of non-genericness, plaintiff has rebutted such presumption by a strong demonstration of the term's genericness with hundreds of articles using the term "net bank" solely in a generic sense, which is controverted only by defendants' non-probative evidence of the report of their expert Professor Yerkes and consumer survey by Mr. Hollander. Accordingly, plaintiff's motion for summary judgment will be granted, and the term "netbank" is held to be generic. The Court will decline to cancel registration of "netbank" under 15 U.S.C. § 1119. In addition, plaintiff's request for attorney's fees under the Lanham Act will be denied.

### ORDER

THIS MATTER having come before the Court upon motion by plaintiff *inter* State Net Bank for summary judgment against defendants NetB@nk, Inc., and NetB@nk; and the Court having considered the parties' submissions; and the Court having heard oral argument on June 10, 2002; and for the reasons stated in the Opinion of today's date;

IT IS on this _____ day of September, 2002, hereby

ORDERED that plaintiff's summary judgment motion [Docket Item 18–1] be, and hereby is, *GRANTED,* and the term NETBANK is held to be generic; plaintiff's request for cancellation of the mark is *DENIED;* and plaintiff's request for attorney's fees under the Lanham Act is *DENIED.*