**INTERSTATE NET BANK, Plaintiff,**

v.

**NETB@NK, INC. and Netb@nk, Defendants.**

**Civil Action No. 01–1324 (JBS).**

United States District Court, D. New Jersey.

Dec. 14, 2004.

Ronald J. Shaffer, Esq., Maureen C. Shay, Esq., Fox Rothschild LLP, Atlantic City, NJ, and Carl D. Poplar, Esq., Cherry Hill, NJ, for Plaintiff.

John J. Levy, Esq., Amelia Carolla, Esq., Montgomery, Mccracken, Walker & Rhoads, Esqs. Cherry Hill, NJ, and Todd E. Jones, Esq., Ryan T. Pumpian, Esq., Powell, Goldstein, Frazer & Murphy, LLP Atlanta, GA, for Defendants.

## OPINION

SIMANDLE, District Judge.

This matter comes before the Court upon Plaintiff *inter* State Net Bank's motion for summary judgment against Defendants NETB@NK, INC., and NETB@NK (now known as NetBank, Inc., and NetBank, respectively, and referred to collectively herein as "Defendants"). Plaintiff filed the underlying action on March 20, 2001, seeking a declaratory judgment that the term "NETBANK" (the federal registration of which had been acquired by Defendants) is generic and merely descriptive, that Plaintiff's use is not likely to cause confusion, and that Defendant's trademark registration should be cancelled. Defendants thereafter asserted counterclaims for trademark infringement, false designation of origin, false advertising, trademark dilution, and cyber piracy under the Lanham Act; declaratory judgment; and trademark infringement, trademark dilution, and unfair competition under New Jersey law. This Court previously determined, upon Plaintiff's motion for summary judgment, that the term NETBANK, for which Defendants have a registered trademark, is generic when applied to internet banking, *interState Net Bank v. NetB@nk, Inc.*, 221 F.Supp.2d 513, 525 (D.N.J. 2002), but declined to cancel NET-

BANK's registration, without prejudice to renewal of the motion after suitable discovery was concluded.

Plaintiff now moves for summary judgment on Defendants' remaining federal claim for infringement of Federal Trademark Registration No. 1,913,750 for Net-Bank and Defendant's remaining state law claim for unfair competition, and for cancellation of the NETBANK registration. The disposition of Plaintiff's noninfringement motion turns upon the question whether Defendants received their assignment of the NETBANK mark through an invalid "assignment in gross" in which the goodwill in that mark was not passed in the reality of the transaction. For the reasons discussed below, Plaintiff's motion will be granted.

## I. *BACKGROUND*

Plaintiff and Defendants are among a growing number of internet banks offering their services to customers primarily or exclusively over the internet. From the aspect of the Defendants, the story begins in May 1994, when Software Agents, Inc., a software engineering consulting company founded by Robert Houston, introduced the "NetBank," described as "an electronic payment system that allows computer users to pay for on-line information services by using 'electronic payment coupons.'" (Certification of Maureen C. Shay, Ex. 1.) The NetBank system was designed to provide a solution to the need for online "pocket change" in small increments which would enable an online business to accept payment from its customers in a real-time transaction. (Shay Cert. Ex. 1; Ex. D, Deposition of Robert K. Houston, 35:11–36:15.) The 1994 press release, which announced the availability of the NetBank stated:

The NetBank solves the problem of selling information electronically and collecting payment on a pay-per-use basis. With the NetBank, customers may provide payment to the merchant at the same time the service is requested. There is no need for a customer to pre-establish credit terms with the merchant, nor must the merchant bill the customer for later payment.

(Shay Cert., Ex. 1.) The system was designed to provide any computer user with an e-mail address the ability to buy and sell information over the Internet. (*Id.*) Customers later were able to use the service to sell physical goods such as printed books. (Shay Cert., Ex. D at 28:18–29:3.)

In July 1994, Boardwatch Magazine, a magazine targeted to electronic bulletin board operators, ran an article with an extensive description of how the NetBank and its electronic money coupons, called "NetCash", system operated as a solution to the need for "pocket change to buy little things online." (Shay Cert., Ex. 2.) Net-Cash was initially obtained by calling a 900 telephone number with a modem. The caller would then be issued a $10 NetCash "coupon" and would be charged $10 on his phone bill. (*Id.*) The method of obtaining NetCash was later changed to allow customers to obtain the electronic coupons by sending a check, money order, or other funds transfer to Software Agents. (Shay Cert., Ex. D at 22:1–22:14.) Customers could obtain NetCash in any dollar amount up to $100. (Shay Cert., Ex. 4.)

The "electronic money coupons" were unique alphanumeric identifiers which would demonstrate to a merchant that the customer had purchased a NetCash coupon in a specified dollar amount which the merchant could accept for payment. (Shay Cert., Ex. D at 96:11–97:15.) The requirement to use the electronic coupons remained constant throughout the use of the service. (*Id.* at 36:1–36:2.) Merchants were required to sign a service agreement

with NetBank and were prohibited from selling any product or service over $100. (Shay Cert., Ex. 4.) To convert NetCash to real money, Software Agents would send the merchant a check for the amount in the merchant's account after subtracting a processing fee. (*Id.*; Ex. D at 16:20–16:21.)

Software Agents filed an application to register NETBANK as a service mark on July 13, 1994, claiming a date of first use in commerce of May 26, 1994. (Shay Cert., Ex. 5.) The mark was registered on August 22, 1995 for "electronic payment services featuring a system of electronic money coupons that are exchanged by means of an on-line computer service" in International Class 36. (*Id.*)

The NetBank system was marketed to merchants and touted as providing "an automated payment collection system for companies and individuals ... selling products or services via electronic mail or online service." (Shay Cert., Ex. 4.) Apparently, the NetBank service did not achieve much acceptance in the marketplace. During its period of operation, approximately 150 merchants registered with the NetBank service and an estimated 2,000 to 3,000 customers used the service to purchase goods or services from those merchants. (Shay Cert., Ex. D at 15:17–15:20.) Software Agents was not a bank, did not intend to establish a bank and did not apply the mark to banking services. (*Id.* at 122:10–122:15.) Moreover, Software Agents did not offer checking, savings or other bank accounts, did not extend loans and did not pay interest. (*Id.* at 18:19–20:12.) The NetBank service thus did not resemble any usual banking service.

In 1995, T. Stephen Johnson and W. James Stokes, two banking industry consultants, conceived of an idea to form an internet-only bank. (Shay Cert., Ex. H at 9:2–9:22.) Internet Organizing Group, Inc. ("IOG") was incorporated in February 1996 to own and operate an internet-only federal savings bank subsidiary they would form under the trade name Atlanta Internet Bank ("AIB"). (Shay Cert., Ex. 6.) From its inception, in October 1996, AIB provided all of the services associated with an internet banking platform, including checking accounts, money market accounts, certificates of deposit, and online bill payment services. (*Id.*; Ex. H at 14:1–14:4.) AIB offered its internet banking services through its website, atlantabank.com, under the mark Atlanta Internet Bank and simply "b@.nk." (Shay Cert., Ex. 6; Ex. C at 30:18–30:20.) IOG filed a trademark application to register the mark "b@.nk" for "providing retail banking services over the internet." (Shay Cert., Ex. 7 at NB004263.) Online bill payment was one component of the services AIB offered as an internet bank.

Electronic bill payment, including online bill payment, is intended to free up a customer's time by providing the ability to direct payments from their checking account electronically rather than by hand writing and mailing numerous checks. (Shay Cert., Ex. 46; Ex. F. at 37:23–38:1.) Online bill payment is a stand-alone service that may, but need not, be provided as part of banking services offered via the internet. (Deposition of David P. Luney at 37–43; Deposition of Timothy J. Patneaude at 11.) Defendants' online bill payment service has been outsourced and provided by CheckFree Corporation ("CheckFree") since its inception in 1996. (*Id.* at 14:5–14:10.)

To obtain access to Defendants' online bill payment, the customer is first required to open a checking account with the bank. (Shay Cert., Ex. 46.) Once consumers are enrolled in online bill payment, they add payees to their payee list and then can

schedule recurring or one-time payments to the payees. (*Id.*) Defendants utilize the "process date good funds model" of Check-Free's online bill payment service. (Shay Cert., Ex. E at 24:5–24:9.) In that model, the customer indicates the date on which payment should be processed for individual bills. (*Id.* at 10:14–11:2.) Defendants recommend that customers schedule payments at least 5 business days prior to the bill's due date. CheckFree requests authorization for that payment from the customer's bank, insuring that there are "good funds" available in the customer's checking account to make the payment. (*Id.* at 22:21–24:23.) Upon authorization, CheckFree executes the payment by transmitting the funds to the payee via an electronic transfer from a CheckFree account or via a paper check drawn on the CheckFree corporate account, and the customer's account is separately debited for the amount. (*Id.* at 24:17–25:13.)

Unlike Software Agents' NetBank system, the bill pay service provided by Defendants is not a point of sale application and therefore cannot be used to complete a transaction at a merchant's site. (*Id.* at 14:2–12:20; Ex. B at 19:11–19:16, 20:6–20:11; Ex. C. at 26:11–28:8.) The Check-Free bill payment service, in contrast, does not use electronic money coupons and does not require the merchant to participate. (Shay Cert., Ex. E at 27:20–28:2; 30:7–30:9.)

IOG retained legal counsel to research the availability of the Net.B@nk name for banking services prior to changing its name to Net.B@nk, Inc. in November 1996. (Shay Cert., Ex. H at 20:16–21:6.) Counsel for Defendants obtained a trademark search report which revealed the existence of the NETBANK registration for "electronic payment services featuring a system of electronic money coupons that are exchanged by means of an on-line computer service" in Class 36, owned by Software Agents. (Shay Cert., Ex. 7.) Defendants determined that the NET.B@NK mark was available for internet banking services and made no attempt to contact Software Agents to acquire or license the Registration or domain name at this time. (Shay Cert., Ex. H at 26:16–27:14.) Defendants ultimately purchased the domain name and service mark from Software Agents for $100,000, pursuant to a Trademark Agreement dated April 9, 1998 (the "Trademark Agreement"). (Shay Cert., Ex. 13.) Defendants conducted minimal due diligence regarding Software Agents' NetBank system prior to acquiring the domain name and trademark. (Shay Cert., Ex. B at 41:6–43:1.) In accordance with the Trademark Agreement, Software Agents immediately ceased its use of the NetBank name. The NetBank Service, however, continued to be provided under a new name, NetCash, to support existing customers. (Shay Cert., Ex. D at 18:1–18:12, 37:4–37:9.) No new customers were added to the system after 1998 and Software Agents stopped offering the service altogether a few years later. (Shay Cert., Ex. D at 18:1–18:12, 37:10–37:15, 39:15–39:20.)

Defendants did not change the name of the bank to NetBank® after acquiring the Registration from Software Agents. Instead, Defendants filed several "intent to use" service mark applications for NET.B@NK applied to retail internet banking services. (Shay Cert., Ex. 15.) In August 1998, AIB announced that it was formally changing its name and logo to "Net.B@nk," consistent with the name of its holding company since 1996. In the August 10, 1998 press release announcing the change, Atlanta Internet Bank stated that the new name was adopted "to better reflect the national and international scope of the bank." (Shay Cert., Ex. 16.) Defendants knew prior to making this name

change that AIB, along with other internet banks, had been referred to generically as a "net bank." (Shay Cert., Exs. 8, 9.) Defendants were also aware of preexisting uses of NetBank as a trademark in internet banking, having obtained an In–Use Investigation regarding Commonwealth Bank of Australia's NetBank. (Shay Cert., Ex. 14.)

Defendants undertook efforts to protect its desired name. From June of 1998 through July 2000, Defendants sent cease and desist letters to numerous alleged infringers. Each of these letters claimed exclusive rights in the NETBANK mark in connection with banking services offered over the Internet, claiming continuous use in commerce since 1996, apparently based on the use of Net.B@nk, Inc. by the holding company. (Shay Cert., Exs. 23–27.)

By early 2000, it appeared as if Defendants' Net.B@nk service mark applications for internet banking were not going to be successful because the Patent & Trademark Office had determined that the term NET BANKING was a common term in the industry for "banking services, including providing financial information, over the global computer network." (Shay Cert., Ex. 10.) Consequently, Defendants attempted to piggy-back on the NET-BANK Registration for "electronic payment services featuring a system of electronic money coupons that are exchanged by means of an on-line computer service," by changing its name and logo in 2000 to its current form, "NetBank." Upon making this change, Defendants began to use the ® symbol in connection with its mark for the first time, apparently asserting that its use of the mark in connection with its internet banking service is protected by a federal trademark registration. (Shay Cert., Ex. 20.) As of August 2000, Defendants also backdated their date of first use, now asserting continuous use in commerce since 1994, not 1996. (Shay Cert., Ex. 30.) This name change was purportedly prompted by the practical difficulties arising out of the use of the "dot" and the "@" symbols. (Shay Cert., Ex. 21.) The change, however, occurred just prior to Defendants' August 22, 2000 deadline to file their Combined Declaration of Use and Incontestability, in which Defendants were required to certify that the NETBANK mark was still in use and had been in continuous use since 1995 for "electronic payment services featuring a system of electronic money coupons that are exchanged by means of an on-line computer service." 15 U.S.C. §§ 1058, 1065. On August 22, 2000, Defendants filed a Combined Declaration of Use and Incontestability for the NETBANK Registration acquired from Software Agents in 1998. (Shay Cert., Ex. 5.)

From the Plaintiff's perspective, it was in 1999 when Attorney Hal Shaffer conceived of an idea for a new bank, which he decided should be called *inter* State Net Bank, a name intended to convey the interstate, commercial aspect of the bank as well as its internet presence and technological capabilities. (Shay Cert., Ex. G at 16:3–16:8, 52:5–52:23.) Plaintiff received its banking charter from the State of New Jersey on March 15, 2001 and began operations in June 2001. (Shay Cert., Ex. 35.) Plaintiff contracted with Digital Insight to provide its internet banking service; Metavante Corporation provides Plaintiff's online bill payment service through Digital Insight. (Shay Cert., Ex. 39 at 8.) Plaintiff's internet banking became available in October 2001. (*Id.*)

In March 2001, after being threatened with an infringement suit by NetBank, *inter* State Net Bank initiated this action seeking a declaratory judgment that the term "net bank" is generic, that Defendants do not have any exclusive rights in

the term "net bank," that there is no likelihood of confusion between *inter* State Net Bank and NetBank, and that the NETBANK Registration should be cancelled. In response, NetBank asserted counterclaims for trademark infringement, false designation of origin, false advertising, trademark dilution, and cyber piracy under the Lanham Act; declaratory judgement; and trademark infringement, trademark dilution and unfair competition under New Jersey law. *inter* State Net Bank filed a motion for summary judgment on the ground that the term, as used in connection with the parties' respective internet banking services, is generic. The Court stayed party discovery during the pendency of the motion.

On September 16, 2002, this Court granted *inter* State Net Bank's motion for summary judgment, ruling that the term NETBANK is generic for internet banking. *interState Net Bank v. NetBank, Inc.,* 221 F.Supp.2d 513, 525 (D.N.J.2002). This Court declined to cancel the NETBANK registration at that time, however, "due to the term's registration for another use," namely, "electronic payment services featuring a system of electronic money coupons that are exchanged by means of an online computer service." *Id.* at 527.

On June 23, 2003, the Court denied NetBank's motion for reconsideration of its summary judgment decision, reconfirming its holding that NETBANK is generic for internet banking. This Court clarified that Defendants' claims for federal trademark infringement and unfair competition under New Jersey law remained viable. (June 23, 2003 Opinion, p. 20.)

Factual discovery is now complete and the remaining counterclaims in this litigation, upon which Plaintiff moves for summary judgment, are:

(1) whether *inter* State Net Bank's use of NET BANK in connection with its online bill payment system literally infringes the federal registration for "electronic payment services featuring a system of electronic money coupons that are exchanged by means of an on-line computer service;" and

(2) whether *inter* State Net Bank has engaged in unfair competition under state law by intentionally attempting to "pass off" its goods and services as those of NetBank.

## II. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. *Id.* Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Id.*

In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "[T]he nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie,* 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) (quoting *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may rea-

sonably be resolved in favor of either party." *Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. 2505; *Brewer v. Quaker State Oil Refining Corp.,* 72 F.3d 326, 329–30 (3d Cir.1995) (citation omitted).

The moving party always bears the initial burden of showing that no genuine issue of material fact exists, regardless of which party ultimately would have the burden of persuasion at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Country Floors v. Partnership of Gepner and Ford,* 930 F.2d 1056, 1061–63 (3d Cir.1991)(reviewing district court's grant of summary judgment in a trademark action); *Lucent Info. Manage. v. Lucent Tech.,* 986 F.Supp. 253, 257 (D.Del.1997)(granting summary judgment in favor of telecommunications provider in trademark action), *aff'd,* 186 F.3d 311 (3d Cir.1999); *Jalil v. Avdel Corp.,* 873 F.2d 701, 706 (3d Cir.1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990). However, where the nonmoving party bears the burden of persuasion at trial, as Defendants do upon their counterclaims, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. 2548.

The non-moving party "may not rest upon the mere allegations or denials of" its pleading in order to show the existence of a genuine issue. Fed.R.Civ.P. 56(e). The counterclaimant must do more than rely only "upon bare assertions, conclusory allegations or suspicions." *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.1985), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985) (citation omitted); *see Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505. Thus, if the counterclaimant's evidence is a mere scintilla or is "not sig-nificantly probative," the court may grant summary judgment. *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505; *Country Floors,* 930 F.2d at 1061–62.

### B. *Defendants' Federal Trademark Infringement Claim*

After this Court's September 16, 2002 decision on Plaintiff's motion for summary judgment as well as the subsequent decision on the motion for reconsideration, the only remaining federal infringement claim is the allegation that *inter* State Net Bank's use of the term NET BANK infringes the Registration for "electronic payment services featuring a system of electronic money coupons that are exchanged by means of an on-line computer service." To prove this allegation, Defendants must show (1) ownership of the NETBANK Registration; (2) that the Registration is valid and legally protectable; and (3) *inter* State Net Bank's use of NET BANK in connection with its own bill payment service is likely to cause confusion. *Checkpoint Systems, Inc. v. Check Point Software Technologies, Inc.,* 269 F.3d 270, 279 (3d Cir.2001).

### 1. *Ownership and Validity of the Trademark*

A trademark is a symbol of the goodwill associated with the product or business it represents and has no significance independent of that goodwill. *Sugar Busters LLC v. Brennan,* 177 F.3d 258, 265 (5th Cir.1999); *Premier Dental Products Co. v. Darby Dental Supply Co.,* 794 F.2d 850, 853 (3d Cir.1986). Since a trademark is but a symbol, "it may be transferred or assigned only to represent the transfer of goodwill connected with a particular business ... and cannot be transferred separately from the goodwill of the business." *Premier Dental Products Co.,* 794 F.2d at 853. *See* Lanham Trademark

Act, § 10, 15 U.S.C.A. § 1060. A purported assignment of a trademark without goodwill is an invalid "assignment in gross." *Sugar Busters*, 177 F.3d at 265. The prohibition against assignments in gross is intended to protect consumers:

> Use of the mark by the assignee in connection with a different goodwill and different product would result in a fraud on the purchasing public who reasonably assume that the mark signifies the same thing, whether used by one person or another.

*Marshak v. Green*, 746 F.2d 927, 929 (2d Cir.1984). Moreover, although transfer of physical or tangible assets is not required, an assignment without the transfer of physical assets will only be upheld where the assignee "is producing a product or providing a service which is *substantially similar* to that of the assignor and where consumers will not be deceived or harmed." *Pilates, Inc. v. Current Concepts, Inc.*, 120 F.Supp.2d 286, 311 (S.D.N.Y.2000)(emphasis added). The mere fact that an agreement purports to assign goodwill along with the trademark is insufficient. *Glow Industries, Inc. v. Lopez*, 273 F.Supp.2d 1095, 1108 (C.D.Cal.2003)(citing *The Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666, 676 (7th Cir.1982)). Rather, courts will look to the "reality of the transaction" to determine if goodwill has passed. *Archer Daniels Midland Co. v. Narula*, 2001 WL 804025 *6 (N.D.Ill. July 12, 2001).

Plaintiffs argue, first, that the assignment of the registration is invalid because there was no transfer of physical assets, as Defendants did not acquire any tangible benefit from Software Agents apart from the trademark registration and domain name. (Shay Cert., Ex. 13; Ex. D at 64:6–

64:21.) Defendants counter that the domain name, in and of itself, is a significant tangible asset. Indeed, the use, and value, of domain names have skyrocketed with the growth of the Internet.[1] It is unclear, however, that a domain name would properly constitute a "tangible" asset, as that term is used in the case law cited above.

■ More important to the present argument, though, is Plaintiff's contention that Defendants have not, despite their contention to the contrary, offered a service "substantially similar" to that of Software Agents' NetBank. As discussed above, Software Agents' NetBank service was designed to appeal to vendors seeking to buy and sell low cost items and information over the internet using electronic "pocket change." It was a person to person system which allowed a user to pay for something at the point of purchase and required that both the vendor and the purchaser be registered to use the system. The offered service was transactional, not a bill paying service, and could only be used to pay for services that were provided by others using the NetBank system. Moreover, Software Agents' NetBank service did not provide checking accounts or require the use of a checking account to utilize the service. (Shay Cert., Ex. D at 65:17–66:2.)

Defendants, on the other hand, have offered a full range of traditional banking services over the internet from its inception in 1996. These services were designed to appeal to retail consumer banking customers who would be attracted to the higher interest rates that were being offered, as well as the convenience and speed of internet banking. Customers are not only able to write paper checks from

---

1. Domain names such as business.com and loans.com sold for $7.5 million and $3 million, respectively, for example. (Def.Ex.11.)

Defendants' offered accounts, but can also make direct payments by submitting payment information over the internet. This bill payment system was operated by CheckFree and directly debited funds from the customers bank account. There was no initial purchase by the customer of an electronic coupon as under the NetCash system, described above.

The distinctions between the two services are made more evident by examining the entities' own descriptions of the function and uses of their systems. The press release announcing the availability of Software Agents' NetBank stated:

> The NetBank solves the problem of selling information electronically and collecting payment on a pay-per-use basis. With the NetBank, customers may provide payment to the merchant at the same time the service is requested. There is no need for a customer to pre-establish credit terms with the merchant, nor must the merchant bill the customer for later payment.

(Shay Cert., Ex. 1.) In addition, the Net-Bank Merchant Agreement, which remained essentially unchanged from the inception of the service until the mark was sold to Defendants, described the NetBank service as:

> [A]n automated payment collection system for companies and individuals ("Merchants") selling products or services via electronic mail or online service. The Merchant named on this agreement may direct anyone wishing to pay for their products or services ("Customer") to obtain a payment coupon ("NetCash") by using the Software Agents' check cashing by FAX ("Fax-Check") service. The Merchant agrees to accept valid NetCash from the customer as payment, and to deliver products or services to the customer without undue delay.

(Shay Cert., Ex. 4.) Merchants also agreed to use the NetBank system "only for selling low cost products and services. The sales price of any product or service paid for with NetCash must not exceed one hundred dollars ($100.00)." (*Id.*)

After the assignment, the NetBank mark for the first time became associated with an internet bank that offered a full range of traditional banking services over the internet. Customers could no longer use the NetBank system to provide payment at the point-of-purchase. NetBank's online bill payment was marketed as follows:

> NetBank's Online Bill Pay and Presentment service helps you free up more personal time by cutting your bill payment time in half! Plus, you save money by not having to buy so many stamps. But best of all, at NetBank—Online Bill Pay and Presentment is TOTALLY FREE when you open a checking account.
>
> > Now, you can pay your bills wherever you are—at home or away on business or vacation. All you need is Internet access.

(Shay Cert., Ex. 5.) In addition, in stark contrast with Software Agents' NetBank system, which allowed for immediate account transfers, Defendants' Online Bill Pay FAQ made clear that the payment date should be set at least five business days in advance of the due date to allow for payment processing. The service was intended only to eliminate the act of writing and mailing checks, not as a means of paying for small on-line purchases from internet merchants. (*Id.*; Ex. 46.)

In arguing that these two services are sufficiently similar, Defendants place almost exclusive reliance on *Visa, U.S.A., Inc. v. Birmingham Trust Nat'l Bank*, 696 F.2d 1371 (Fed.Cir.1982). There, the

plaintiff, Visa, filed an application with the Patent and Trademark Office to register the mark "O.K." for check-cashing services using a card. *Visa*, 696 F.2d at 1372. The defendant, Birmingham Trust National Bank, filed an application for the mark "OK" for banking services, including a check-cashing card program. *Id.* at 1372–73. The parties filed opposition proceedings against each other's applications, and the rights to the mark for the proposed services came down to the validity of the assignment from a third party (grocery store chain Alpha Beta) to Visa. *Id.* at 1373. The Federal Circuit upheld the assignment, comparing the services offered by the grocery store chain and Visa under the "OK" mark, and concluding that they were "the same basic service, namely, providing a means by which the holders of the card could make purchases by check upon showing the card." *Id.* at 1376.

Unlike in *Visa*, here, Software Agents and NetBank did not provide the "same basic service." Rather, the two services are substantially distinct, as the two services perform entirely different functions and appeal to vastly disparate consumer groups. Those distinctions, moreover, outweigh any superficial similarity. *See Glow Industries, Inc. v. Lopez*, 273 F.Supp.2d 1095, 1113 (C.D.Cal.2003)(generally similar products are not substantially similar if they have key differences designed to appeal to distinct customer groups). No reasonable factfinder could find to the contrary on this point.

Furthermore, although the Trademark Agreement purports to assign Defendants "all of Software Agents' rights in the mark and name 'NETBANK' and in all the goodwill appurtenant thereto" (Shay Cert., Ex. 13), Defendants made no attempt to benefit from any existing goodwill, as Defendants did not use the mark in connection with any type of service identified with Software Agents' services. Case law directs courts to look to the "reality of the transaction" in determining whether goodwill has passed. *Archer Daniels Midland Co.*, 2001 WL 804025 at *6. The record suggests that Defendants' only interest in Software Agents' business was in purchasing its domain name. (*Id.*, Ex. C at 37:18–37:21.) (*See also* Shay Cert., Ex. H at 29:15–29:18 ("I was interested in at that time the URL or the name that you use to call up on the internet. That was the extent of my interest in NetBank.")) Following its acquisition of the Registration, Defendants changed the name of the bank to Net.B@nk™, not NetBank®, and widely publicized the "new" name of the bank, stating that "[t]he name change will be accompanied by a new corporate identity campaign." (*Id.*, Ex. 16.) The banking services offered by Defendants did not change and Defendants assured it customers that, despite the change in name, everything else would remain the same: "Even though our name and logo are changing, Net.B@nk will continue to provide the same quality products and services and superior interest rates that Atlantic Internet Bank is known for." (*Id.*) The assignment, therefore, was to obtain and use the NETBANK trademark without obtaining and using any of the goodwill accompanying that mark.

The Court holds that no genuine dispute of material fact exists, and that Plaintiff has established as a matter of law that Defendants acquired the NETBANK trademark registration through an invalid assignment in gross—that is, without the transfer of the accompanying goodwill. Therefore, the registration should be cancelled at this time. Summary judgment will be entered in favor of Plaintiff directing the cancellation of the NETBANK registration owned by Defendants.

### 2. *Abandonment and Registration Cancellation*

The Lanham Act provides that a trademark registration, even an incontestable registration, may be cancelled at any time if the registered mark has been abandoned. 15 U.S.C. §§ 1064, 1115(b)(2). A trademark is deemed abandoned when "its use has been discontinued with intent not to resume such use." 15 U.S.C. § 1127. The party asserting abandonment must show, by clear and convincing evidence, "(1) discontinuance of use of the mark, and (2) an intent not to resume use within a reasonably foreseeable time in the future." *EH Yacht, LLC v. Egg Harbor, LLC,* 84 F.Supp.2d 556, 564 (D.N.J.2000). Moreover, nonuse for three consecutive years is prima facie evidence of abandonment. 15 U.S.C. § 1127.

Here, the effect of the invalid assignment of the trademark registration from Software Agents to Net.B@nk is that the rights revert to Software Agents, the original registrant. Software Agents, however, ceased any use of the term NETBANK as of April 1998. Since this cessation of use occurred more than three years ago, prima facie evidence of abandonment exists and in the absence here of anything in the record to support an inference that Software Agents intends to resume any use, cancellation of the registration is appropriate.

It should be noted that this Court makes no finding regarding Plaintiff's additional contention that the registration's incontestable status was obtained by fraud, requiring cancellation of the registration. It is not necessary to examine this additional ground for cancellation of the registration. Furthermore, having found the registration to be invalid, this Court need not address the third required showing of a likelihood of confusion necessary for Defendants to prove infringement.[2] This Court will therefore enter summary judgment in favor of Plaintiff on the Defendants' remaining federal trademark infringement claim.

### C. *Defendants' Unfair Competition Claim*

This Court previously held that NETBANK is generic for internet banking and Defendants cannot prevent *inter* State Net Bank or others from using NETBANK in connection with internet banking services. *interState Net Bank,* 221 F.Supp.2d at 525. In the remaining state law unfair competition claim, Defendants claim that, by utilizing the generic term NET BANK in connection with its banking services, Plaintiff *inter* State Net Bank is "deliberately deceiving customers and potential customers by passing off its services and products as those of NetBank." (Counterclaim, ¶ 122.)

The essence of unfair competition is the sale of one's own goods for those of another person; in short, it is a species of deceit. *Standard Paint Co. v. Trinidad Asphalt Mfg. Co.,* 220 U.S. 446, 461, 31 S.Ct. 456, 55 L.Ed. 536 (1911). In addition, common law unfair competition, governed here by New Jersey law, covers a broader spectrum of behavior than trademark or service mark infringement. "In fact the common law of trademarks is but a part of the broader law of unfair competition." *Hanover Star Milling Co.*

---

**2.** Because Defendants are unable to make the second requisite showing for a federal infringement claim that the registration is valid and legally protectable, as discussed above, this Court need not reach the third and final element of likelihood of conclusion. Thus, the Court need not consider the original expert report of Dr. Jacob Jacoby (*see* Declaration of Ryan T. Pumpian, Esq., Ex. 21) or Defendants' sur-reply brief which seeks to rebut the claims made by Plaintiff's expert, Dr. Alex Simonson.

*v. Metcalf,* 240 U.S. 403, 413, 36 S.Ct. 357, 60 L.Ed. 713 (1916). "It is possible to be guilty of unfair competition even when trademark infringement is not present, if use of a similar but noninfringing mark or device is combined with unfair practices in a manner which is likely to deceive purchasers regarding the origin of goods under all the circumstances." *Fotomat Corp. v. Photo Drive–Thru, Inc.,* 425 F.Supp. 693, 708–09 (D.N.J.1977)(Gerry, J.). In order to succeed on its state unfair competition claim, Defendant must show (1) intent to deceive and (2) likelihood of deception or confusion. *See Estate of Presley v. Russen,* 513 F.Supp. 1339, 1375 (D.N.J.1981)(holding that analysis must focus on the totality of the factors bearing on whether the defendant by his activities in the marketplace has attempted to deceive or confuse the public); *Fotomat Corp.,* 425 F.Supp. at 708–09.

■ With respect to intent to deceive, Defendants have offered nothing to show that Plaintiff, in naming its company *inter* State Net Bank, actively sought to confuse or dupe the public. The evidence instead supports Plaintiff's contention that it relied on the opinion of its counsel that the name was available and its use would not infringe the existing registration. (Shay Cert., Ex. G, 65:18–71:4.) Thus, the record lacks any evidence of bad faith. *See Smith v. Ames Dept. Stores,* 988 F.Supp. 827, 838 (D.N.J.1997); *Pharmacia Corp. v. Alcon Laboratories, Inc.,* 201 F.Supp.2d 335, 375 (D.N.J.2002)("The reasoned judgment by counsel that [the name] was available precludes a finding of bad faith."). In addition, *inter* State Net Bank's consistent use of and emphasis on the *"inter* State" portion of its mark further negates any finding of bad faith. *See Vision Center v. Opticks, Inc.,* 596 F.2d 111, 118 (5th Cir. 1979), *cert. denied,* 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980)(emphasis on word "Pearle" in "Pearle Vision Center," where vision center was merely descriptive, negated any charge of deception or unfair competition). Thus, this Court is unable to find any triable issue of fact with respect to an alleged deceptive intent.

Moreover, even assuming an issue of fact regarding *inter* State Net Bank's intent in selecting its name, Defendants are further unable to demonstrate a triable issue with respect to a likelihood of confusion. In order to prove likelihood of confusion, Defendants must establish that consumers viewing the *inter* State Net Bank mark would assume that its products or services are associated with Defendants. *Checkpoint Systems,* 269 F.3d at 280. The Third Circuit applies a multi-factor test, originally set forth in *Interspace v. Lapp, Inc.,* 721 F.2d 460, 463 (3d Cir.1983)(the so-called *"Lapp* factors"), to determine whether there is a likelihood of confusion. Although the multi-factor test was first applied to non-competing goods, it is also applied to trademark disputes involving competing goods or services. *Checkpoint Systems,* 269 F.3d at 280 n. 8 (3d Cir. 2001). *See also A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 207 (3d Cir.2000); *Commerce Bancorp, Inc. v. BankAtlantic,* 285 F.Supp.2d 475, 492 (D.N.J.2003).

■ The *Lapp* factors include: (1) the degree of similarity of the marks; (2) the strength of the owner's mark; (3) the price of the goods and "other factors indicative of the care and attention expected of consumers when making a purchase"; (4) the length of time of concurrent use without evidence of actual confusion; (5) the intent of the junior user in adopting the mark; (6) evidence of actual confusion; (7) whether the goods are marketed or advertised through the same channels of trade or same media; (8) the extent to which the targets of the parties' sales efforts are the

same; (9) the relationship of the goods in the minds of the consumers because of the similarity of functions; and (10) "other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market or that he is likely to expand into that market." *Checkpoint Systems*, 269 F.3d at 280. None of the factors is determinative and the various factors may be accorded different weights depending on the circumstances. *Id.; A & H Sportswear*, 237 F.3d at 215. Moreover, "[n]ot all of the factors need be considered if some are dispositive." *Pharmacia Corp. v. Alcon Laboratories, Inc.*, 201 F.Supp.2d 335, 372 (D.N.J.2002).

In support of its motion for summary judgment, Plaintiff did not introduce or rely upon any expert opinion with its opening brief to address the issue of likelihood of confusion. In opposing this motion, however, Defendants introduced the results of a survey conducted by Dr. Jacob Jacoby, which they allege was designed to estimate the degree of confusion between the parties' names. On July 7, 2004, Plaintiff filed and served its reply which included references to the report of Plaintiff's expert, Dr. Alex Simonson, who relied solely on Dr. Jacoby's data to perform his own analysis. By letter dated November 1, 2004, Defendants requested permission to file a limited sur-reply brief to challenge Dr. Simonson's conclusions.

Defendants seek to create a triable issue of fact on this point by taking issue with Plaintiff's expert's analysis of Dr. Jacoby's survey results. Even accepting Dr. Jacoby's data as properly analyzed, thereby rejecting Dr. Simonson's critique, the survey estimates a 16% likelihood of confusion. Such a low level of statistically predicted confusion, however, simply is not actionable in light of the overwhelming actual evidence in the record of a lack of confusion, as will be discussed below. Indeed, the parties' use for a period of three and a half years without instances of consumer confusion, the high degree of care exercised by consumers in selecting banking services, and the inherent weakness of the mark, among others, supports Plaintiff's argument that there has been no confusion nor is future confusion likely. *See Versa Products Co. v. Bifold Co.*, 50 F.3d 189, 205 (3d Cir.1995)(the longer the challenged product has been in concurrent use without actual confusion, the stronger the inference that confusion is not likely); *Pharmacia Corp.*, 201 F.Supp.2d at 372. The Court will now examine the most dispositive *Lapp* factors that lead it to conclude that a genuine issue regarding confusion is absent.

### 1. *Degree of Similarity of the Marks*

While it is true that the two marks share a common element—the phrase NET BANK—that is where their similarity ends. Defendants' mark is "NetBank," one word, while Plaintiff's is *"inter* State Net Bank," three words. Each party consistently uses different fonts with their marks and a portion of Plaintiff's is italicized; *inter* State Net Bank's mark appears as two lines juxtaposed with the "i" sign. Moreover, the parties' respective uses of their logos on their websites and in advertisements create distinct commercial impressions. *inter* State Net Bank utilizes an interstate highway sign and visualization of a road to emphasize the "interstate" portion of the mark. NetBank, in contrast, uses its own, different symbol. Thus, the marks are visibly different and distinct; any similarity between the marks is insufficient to raise a genuine issue of material fact as to the likelihood of confusion. *See Commerce Bancorp*, 285 F.Supp.2d at 493 (FLORIDA'S MOST CONVENIENT BANK and AMERICA'S MOST CONVENIENT BANK, used with

house marks, are distinct and do not raise issue of fact regarding confusion).

### 2. Strength of the Owner's Mark

This Court previously determined that the mark NetBank is generic for internet banking services, of which online bill payment is merely a component. Indeed, the NetBank registration exists in a field in which each mark is relatively weak. *See Pharmacia*, 201 F.Supp.2d at 376; *Commerce Bancorp.*, 285 F.Supp.2d at 493 (evidence of third party use supports finding that mark is not strong). Other registrations incorporating the term NETBANK exist, including ENTERNETBANK registered by Mellon Bank, N.A., for banking services, and FIRSTNETBANK, registered by Evex, Inc., for business exchange services. (Shay Cert., Ex. 37). The record also shows numerous users of the term Net Bank in connection with internet banking: Commonwealth Bank of Australia (NetBank); Prosperity Bank (Net Bank); Century Bank (Century Net Bank FSB and Centurynetbank.com); First National Bank & Trust Broken Arrow (First NETBANK); First National Bank of Wyoming (NET–BANK); Sovereign Bank (NetBanking). (*Id.*, Ex. 38). All of these banks offer online bill payment. (*Id.*)

### 3. The Sophistication of the Market

"When consumers exercise heightened care in evaluating the relevant products before making purchasing decisions, courts have found there is not a strong likelihood of confusion." *Checkpoint Systems*, 269 F.3d at 284. Consumers undoubtedly exercise a high degree of care in selecting banking and financial services and are likely to note difference in names. Indeed, numerous courts have determined that there is "minimal or no likelihood of confusion even where the names of financial institutions share the same dominant terms." *First National Bank in Sioux Falls v. First National Bank, South Dakota*, 153 F.3d 885, 889 (8th Cir.1998)(finding no likelihood of confusion between "First National Bank in Sioux Falls" and "First National Bank, South Dakota"). This Court itself, in *Commerce Bancorp*, has held that because "people are especially selective in choosing their banking and financial services, and thus take great care in choosing such services, as well as the fact that customers over the Internet are more likely to be able to differentiate between the two companies, this factor fails to support a likelihood of confusion." 285 F.Supp.2d at 494. That same logic applies with equal force here.

### 4. Length of Time of Use of Mark Without Actual Confusion

*inter* State Net Bank has used the allegedly infringing mark for over three years without evidence of actual confusion and Defendants have themselves conceded that there is no evidence of such confusion. (Shay Cert., Ex. 41 at 18; Ex. H at 78:11–78:14; Ex. C at 120:24–121:2). The only evidence of any confusion here is an example of a NetBank customer's check being misdirected by the Federal Reserve Bank and a misdirected phone call from a reporter. (*Id.*; Ex. 39 at 11; Ex. 40; Ex. 42; Ex. A at 191:13–193:9, 202:5–206:2). Notably, neither of these instances involve confusion on the part of consumers.

### .5. Intent of the Alleged Infringer

Evidence of intentional, willful and admitted copying of a mark weighs in favor of finding a likelihood of confusion. *Checkpoint Systems*, 269 F.3d at 286. The Third Circuit has held, however, that:

[A] defendant's mere intent to copy, without more, is not sufficiently probative of the defendant's *success* in causing confusion to weigh such a finding in

the plaintiff's favor; rather, defendant's intent will indicate a likelihood of confusion only if an intent to *confuse* consumers is demonstrated via purposeful manipulation of the junior mark to resemble the senior's.

*A & H Sportswear, Inc.*, 237 F.3d at 226 (emphasis in original). *See also Commerce Bancorp*, 285 F.Supp.2d at 495 (finding no likelihood of confusion despite evidence of intentional copying).

Here, no evidence of intentional copying exists and, moreover, no presumption of intentional copying arises where the marks as a whole are not identical. *Pharmacia*, 201 F.Supp.2d at 375. In addition, the record is wholly absent of any fact suggesting wrongful intent on the part of Plaintiff or a desire to deceive consumers. Plaintiff knew of NetBank's existence when it adopted its mark and its trademark search and reliance on the advice of counsel acts to "preclude any triable issue of fact as to bad faith or carelessness" in adopting its mark. *Pharmacia*, 201 F.Supp.2d at 375 ("The reasoned judgment by counsel that [the name] was available precludes a finding of bad faith.").

### 6. *Similarity of Channels of Trade and Overlapping Sales Targets*

The greater the similarity in the parties' advertising and marketing campaigns, the greater the inference of likelihood of confusion. *Checkpoint Systems*, 269 F.3d at 288–89. Here, Defendants spend millions of dollars advertising their internet banking and related services in print media, on the internet, on the radio, and through partnering with money management software packages such as Quicken, on a national and international basis. (Shay Cert., Ex. 41 at 18; Ex. 49). *inter* State NetBank, by contrast, focuses on sponsoring and participating in local organizations

and events. (*Id.;* Ex. 36 at 35–36; Ex. 39 at 9–10; Ex. 43).

Plaintiff, however, does advertise on the internet, primarily by posting its current interest rates on various interest rate monitors. (*Id.;* Ex. A at 92:6–93:21). Thus, the internet is likely to be a "channel of trade" where the parties' advertising and marketing efforts may overlap. This Court has held, however:

> Online advertising is accessible by customers of both plaintiff and defendant, but this would not necessarily result in an intermixing of plaintiff's and defendant's customers or of the targets of their respective sales and advertising efforts because, as discussed earlier, more care is involved in the accessing of financial services over the internet. In other words, there is no overlap of provision of services in the bricks and mortar context, and to the extent that there may be overlap in the online context, the high degree of care involved in selecting financial and banking services may negate such an effect.

*Commerce Bancorp*, 285 F.Supp.2d at 495–96.

### 7. *Relationship of the Goods in the Mind of Consumers*

This factor requires courts to "examine whether buyers and users of each party's goods are likely to encounter the goods of the other, creating an assumption of common source affiliation or sponsorship." *Checkpoint Systems*, 269 F.3d at 286. Users of one party's bill payment services are not likely to encounter that of another because the user must first be a customer of the bank before it can gain access to the service. The user must have a checking account, user identification or account number, register for online banking and obtain a secure password. (Shay Cert., Ex. A at 170:6–171:17, 178:15–185:3; Ex.

45.) Thus, it is virtually impossible for a customer or potential customer to mistakenly access the wrong entity's bill payment service. There is no evidence that anyone is actually a customer of both banks.

Based on its review of these factors and the record before it, this Court finds no genuine issue of material fact in dispute with respect to a likelihood of confusion. Therefore, this Court finds no triable issue with respect to this claim and will enter summary judgment in favor of Plaintiff on Defendants' counterclaim of unfair competition under New Jersey law.

### D. *Plaintiff's Request for Attorneys' Fees*

■ Section 35(a) of the Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). Fees are available not only for the prevailing trademark owner, but also for an accused infringer who successfully defeats the infringement claims. *Securacomm Consulting, Inc. v. Securacom Inc.*, 224 F.3d 273, 280 (3d Cir.2000). In determining whether to award fees to a successful defendant in an infringement action:

> The court should consider both the objective merits of plaintiff's action (whether it was unjustified, groundless, or frivolous) and the plaintiff's subjective conduct throughout the litigation (whether vexatious or involving other misconduct).... The plaintiff does not need to have acted in bad faith for defendant to be awarded fees, though bad faith is an appropriate factor to consider in making the determination.

*J & J Snack Foods, Corp. v. Earthgrains Co.*, 2003 WL 21051711 *3 (D.N.J. May 9, 2003).

■ In its September 16, 2002 Opinion and Order on Plaintiff's motion for summary judgment, this Court denied *inter* State Net Bank's request for fees, finding that Defendant was entitled to attempt to protect its mark. *interState Net Bank*, 221 F.Supp.2d at 527. Again, as it did then, this Court notes that the Third Circuit has held that an exceptional case under § 35(a) of the Lanham Act must involve culpable conduct, such as bad faith, fraud, malice, or knowing infringement, on the part of the losing party. *Securacomm Consulting, Inc.*, 224 F.3d at 279–80(citing *Ferrero U.S.A., Inc. v. Ozak Trading, Inc.*, 952 F.2d 44, 47 (3d Cir.1991)).

Based on the record before it, this Court remains unwilling to find that Defendants acted in bad faith, fraud, or malice in the usage of its service mark. Defendants and their counsel, while not ultimately prevailing here, litigated this matter in a professional and reasonable manner. The Court therefore holds that this situation is not one of those exceptional cases, entitling a party to an award of attorneys' fees, and Plaintiff's request for such fees will be denied.

### CONCLUSION

For the reasons expressed herein, this Court will grant Plaintiff's motion for summary judgment. The accompanying Order is entered.

### ORDER

This matter having come before the Court upon motion for summary judgment by Plaintiff *inter* State Net Bank for summary judgment against Defendants NetB@nk, Inc., and NetB@nk; and the Court having considered the parties' submissions; and for the reasons stated in the Opinion of today's date; and for good cause shown;

IT IS this *14th* day of December, 2004, hereby

ORDERED that Plaintiff's summary judgment motion [Docket Item No. 55–1] shall be, and hereby is, *GRANTED;* and

IT IS FURTHER ORDERED that the NETBANK trademark registration no. 1,913,750 shall be, and hereby, is *CAN-CELLED;* and

IT IS FURTHER ORDERED that the Clerk of Court shall close this case upon his Docket.